David Junior **BROWN**, Petitioner–
Appellant,

v.

James B. **FRENCH**, Warden, Central
Prison, Raleigh, North Carolina,
Respondent–Appellee.

No. 97–22.

United States Court of Appeals,
Fourth Circuit.

Argued March 5, 1998.

Decided June 10, 1998.

**ARGUED:** Bruce Tracy Cunningham, Jr., Cunningham, Dedmond, Petersen & Smith, L.L.P., Southern Pines, North Carolina; Henderson Hill, Ferguson, Stein, Wallas, Adkins, Gresham & Sumter, P.A., Charlotte, North Carolina, for Appellant. Barry Steven McNeill, Special Deputy Attorney General, North Carolina Department of Justice, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Michael F. Easley, Attorney General of North Carolina, North Carolina Department of Justice, Raleigh, North Carolina, for Appellee.

Before MURNAGHAN and ERVIN, Circuit Judges, and MOON, United States District Judge for the Western District of Virginia, sitting by designation.

Affirmed by published opinion. Judge ERVIN wrote the opinion, in which Judge MURNAGHAN and Judge MOON joined.

ERVIN, Circuit Judge:

David Junior Brown appeals the district court's denial of his petition for a writ of habeas corpus. Brown raises three issues on appeal. First, Brown argues that the prosecutor's failure to disclose allegedly material, exculpatory information violated his Fourteenth Amendment right to due process, as interpreted in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Second, Brown argues that the cumulative effect of prosecutorial misconduct during his trial deprived him of his Sixth Amendment right to the effective assistance of counsel. Finally, Brown argues that his Eighth and Fourteenth Amendment rights were violated when the trial court allowed the admission, during the penalty phase, of Brown's purported confession to his cellmate when the State previously had not introduced this testimony at the guilt phase of the trial. Finding none of the claims meritorious, we affirm.

## I.

David Brown worked as a chef in a hotel in Pinehurst, North Carolina. On the evening of Sunday, August 24, 1980, Brown was the disc jockey for a party at which he consumed a substantial amount of alcohol and took at least five amphetamines. Brown had a distinctive silver ring which he wore to this party, although he avers that he took it off while playing records about one-half hour after arriving at the party.

At approximately 11:30 p.m. on Sunday evening, Brown and a group of people left the party and went to a nightclub. Police officers later observed Brown walking on the highway near the nightclub at approximately 2:10 a.m. (now Monday morning). Brown was walking barefoot, staggering, and carrying his shoes. The police officers gave him a ride to his workplace, the Pinehurst Hotel,

and left him at the kitchen entrance at approximately 2:45 a.m. A supervisor at the hotel saw Brown making a phone call from the hotel's front office between 2:30 and 3:00 a.m. and Brown left the hotel at approximately 3:00 a.m. Brown testified that he arrived back at the hotel at 6:00 a.m., although no one can independently corroborate his whereabouts until approximately 7:00 a.m. A co-worker testified that she saw Brown at work at 7:00 a.m. with two band-aids on his left thumb, and that Brown was not wearing his distinctive silver ring. Brown told his co-worker that he was in pain and that he had cut his hand. A nurse at a nearby hospital testified that she saw Brown at the hospital on Monday night at 11:00 p.m., at which time he was recovering from surgery to repair cut tendons in his left hand.

The victims in this case were Shelly Diane Chalflinch, twenty-six, and her nine-year-old daughter, Christina. They lived in the same apartment complex as Brown, the Married Quarters Apartments in Pinehurst. At trial, the evidence showed that Diane Chalflinch was last seen alive at approximately 1:00 a.m., early Monday morning, walking toward the apartment complex's laundry room. Brown developed testimony at an evidentiary hearing below that suggested Chalflinch may have been seen as late as 5:00 a.m. Chalflinch did not go to work on Monday morning and did not phone to explain her absence. Co-workers went to her apartment and knocked but heard no response. When Chalflinch did not arrive at work again on Tuesday morning, her co-workers phoned the police.

Police discovered a gruesome scene when they entered the Chalflinches' apartment on Tuesday morning. Both Diane and Christina had been repeatedly stabbed to death. Diane Chalflinch had approximately 100 stab and cut wounds. Christina's body also bore multiple stab wounds, including several in the head, and a brown electrical cord was wrapped around her neck. Blood was on the floor and the walls.

Several pieces of physical evidence connected Brown to the murders. Luminol and phenolphthalein tests, used to determine the presence of blood undetectable to the human eye, revealed prints of bare feet in the kitch-

en. Police discovered patterns of blood outside the Chalflinches' front door, on the steps leading down from their apartment, and on the concrete pad at the foot of the steps. A fingerprint expert identified a latent palm print on Diane Chalflinch's bedroom wall as that of Brown's left palm print. At the door to Brown's apartment, visible bloodstains were found on the concrete stoop. The luminol test indicated the presence of blood on Brown's doorknob and bare footprints of blood all over his kitchen floor. There was a drop of blood on Brown's toolbox, which contained several knives, and on a pillow at the head of his bed. In the Chalflinches' apartment, police found a bloody knife blade, broken at both ends, with the inscription "R. H. Forschner" printed on it. Brown's toolbox, seized by police from his apartment, contained a collection of knives bearing the inscription "R. H. Forschner." According to the evidence developed at the federal evidentiary hearing, Forschner knives are rare, imported, professional chef's knives which Brown used in his work as a cook at the hotel. Finally, the autopsy of Diane Chalflinch revealed Brown's distinctive silver ring underneath her liver.

In December 1980, Brown was tried and convicted of first-degree murder in the deaths of both victims. After a separate penalty phase, the jury returned with sentences of death for both murders. The North Carolina Supreme Court affirmed the convictions and sentences. *State v. Brown*, 306 N.C. 151, 293 S.E.2d 569 (1982), *cert. denied*, 459 U.S. 1080, 103 S.Ct. 503, 74 L.Ed.2d 642 (1982). A North Carolina district court denied Brown's post-conviction motion for appropriate relief, and both the Supreme Court of North Carolina and the U.S. Supreme Court denied certiorari.

In April 1987, Brown filed a petition for writ of habeas corpus in federal court for the Western District of North Carolina. The district court denied Brown's claims of error from the guilt phase of his trial, granted the writ on three of his penalty phase claims, and declined to consider another ten penalty phase claims. A previous panel of this court affirmed the portion of the order denying Brown's guilt phase claims and reversed the portion of the order granting the writ as to his death sentences. *Brown v. Dixon*, 891 F.2d 490 (4th Cir.1989). We remanded the case to the district court for consideration of the remaining ten claims in Brown's petition and of new evidence that had become available to Brown's counsel while the case was on appeal.

In 1996, the case was assigned to a magistrate judge who held an evidentiary hearing and considered the parties' summary judgment arguments. The magistrate judge recommended that the remaining claims in Brown's petition be denied and that judgment be entered for the State. The district court adopted the magistrate judge's recommendations and denied the writ. Brown then filed a motion to reconsider, treated by the district court as a Rule 59(e) motion to alter or amend the judgment, which was denied.

## II.

The district court's denial of the writ, granting summary judgment to the State, is a final judgment over which this court has jurisdiction pursuant to 28 U.S.C. §§ 1291 & 2253 (1994). Before addressing the merits of this case, we first decide two preliminary matters raised by the State.

 First, the State argues that the standard of review governing all Brown's claims should be limited to instances of the district court's abuse of discretion. The State contends that Brown's notice of appeal appears to cover only the district court's denial of Brown's Rule 59(e) motion to amend the judgment, rendered on July 29, 1997, and not the underlying Order, rendered on May 2, 1997, that granted the State summary judgment. Our review of the denial of a Rule 59(e) motion, as opposed to the merits underlying the motion, is for an abuse of discretion. *See Temkin v. Frederick County Comm'rs*, 945 F.2d 716, 724 (4th Cir.1991). The language of the notice is the following: Brown appeals "from the Order entered on July 29, 1997, denying Petitioner's motion for relief from the final judgment under Rule 59(e) and reaffirming the May 2, 1997, Order dismissing a petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254,

and each and every part of that order." *J.A.* at 710.

■ Every circuit court to address the question has held that designation of a post-judgment motion in the notice of appeal is adequate to support a review of the final judgment when the intent to do so is clear. *See* Moore's Federal Practice § 303.21[3][c][vii] at n. 61 (3d ed.1998) (citing cases). We believe that an intent to appeal the underlying final judgment is clear from the language in Brown's notice. This is especially so considering that the courts of appeal "should be liberal in passing on the sufficiency of a notice of appeal." *Gunther v. E.I. du Pont De Nemours & Co.*, 255 F.2d 710, 717 (4th Cir.1958). Given this construction of the notice requirement, we find that the language in the notice of appeal indicates an intent to appeal the district court's summary judgment order of May 2. Accordingly, we review Brown's legal arguments, and mixed questions of law and fact, *de novo*. *Savino v. Murray*, 82 F.3d 593, 598 (4th Cir.1996).

■ Second, the State relies on the same "notice argument" in a motion to dismiss Brown's claim regarding the penalty phase testimony of Brown's cellmate. The State argues that this claim was not included in Brown's Rule 59(e) motion and therefore we lack jurisdiction to review it. *See Gunther*, 255 F.2d at 717–18 (holding that jurisdiction of the appellate court is determined by timeliness and specific terms of the notice of appeal). For the reasons articulated above, however, we believe that Brown's notice evidences a clear intent to appeal the May 2 Order, and that the State is not prejudiced by allowing Brown to proceed with his argument. Accordingly, we deny the State's motion to dismiss Brown's argument for lack of jurisdiction.

## III.

### A.

■ Brown claims that the prosecutor's efforts to withhold and conceal information from the defense deprived him of his right to due process of law. In order to succeed on this claim, Brown must meet the standard articulated by the Court in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny. Under *Brady*, the government violates a defendant's constitutional right to due process when it withholds material, exculpatory evidence from the defense. *See Brady*, 373 U.S. at 83, 83 S.Ct. 1194; *Hoke v. Netherland*, 92 F.3d 1350, 1356 (4th Cir.1996). Evidence is "material" only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Hoke*, 92 F.3d at 1356 (quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)).

Brown alleges three instances in which the prosecutor withheld or attempted to conceal material, exculpatory information from the defense. Our review of these contentions, however, demonstrates that in none of these cases was Brown deprived of information that would have yielded a different result at his trial. First, Brown points to Willie Squires, a store-owner for whom Diane Chalflinch had previously worked, who testified at the evidentiary hearing that Diane and her daughter were in his store, in the company of a large woman, in the early morning hours of Monday, August 25, between 4:30 and 4:45 a.m. Prior to trial, Squires had spoken to police officers, but that information was withheld from Brown's trial counsel. Squires' testimony at the evidentiary hearing, however, was contradicted by the State's witness, John Henry Brown. Brown presented compelling testimony that Squires could not have been correct that the Chalflinches were in the store at 4:30 a.m. on Monday morning; rather, John Henry Brown testified that the Chalflinches were in the store early on *Sunday* morning, around 4:30 or 4:45 a.m. But even if we credit Squires' testimony, it only reduces the time frame in which David Brown could have killed the victims to between 5:00 and 6:00 a.m., a highly plausible theory because the apartments are a short walk from the hotel where Brown worked. *See J.A.* at 574–75.

Second, Brown mentions David Martin, who apparently had a date with Diane Chalflinch for Saturday, August 23, and left a

"terse note" on her door when she stood him up. Brown did not present this evidence at trial and he contends that had the police conducted an investigation, it would have supported the testimony of Raymond Pate (who did testify at trial) that he saw a blond, long-haired man jumping from a second-floor apartment at the Marriage Quarters on Monday afternoon, August 25. Apparently, David Martin had long, blond hair during this time period. The State points out, however, that David Martin was seen in Macon, Georgia, where he attended law school, during the time the murders could have taken place, and there is no reason to suspect that he was the perpetrator of these crimes. Also, based on Pate's testimony at trial, the "Martin note" provides no support for a theory that a blond, long-haired man was the murderer. On Monday afternoon, Pate saw a man jumping from a second-floor apartment that was at the *opposite end* of the complex from the Chalflinches' apartment. Pate did not claim to have seen anyone jumping from the balcony of the Chalflinches' apartment, and the jury obviously disregarded the defense's theory at trial that the blond, long-haired man was involved in the crimes. That David Martin had long, blond hair and left a note for Diane Chalflinch the day before the murder may be coincidental, but it does not undermine confidence in the outcome of the trial.

Third, Brown points to evidence that the prosecutor deliberately moved one witness, Clarence Harding, from one hotel to another during trial in order to keep him away from defense counsel. Brown also claims that the prosecutor specifically instructed Harding not to talk to defense counsel. Brown's counsel sought to question Harding about the defense theory that Chalflinch's car may have been moved during the day on Monday, August 25. The State points out, however, that the defense at trial included testimony, from Pate rather than Harding, that Chalflinch's car may have been moved during Monday afternoon. Because the evidence which the defense would have received from having unfettered access to Harding would not have provided any additional exculpatory information that was not otherwise before the jury at trial, the prosecutor's conduct does not undermine confidence in the outcome of this trial.

Brown frequently cites to *Kyles v. Whitley,* 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), in support of his argument. In *Kyles,* the Supreme Court held that the prosecutor's withholding of certain evidence regarding its witnesses at trial sufficiently undermined confidence in the outcome of the trial to find that the suppressed evidence was "material." *Kyles* is far different from Brown's case, however, since in *Kyles* "the essence of the State's case was the testimony of eyewitnesses, who identified Kyles as [the] killer." *Id.* at 441, 115 S.Ct. 1555. The Court relied on the fact that apart from the testimony of eyewitnesses, "the physical evidence ... would, by the State's own admission, hardly have amounted to overwhelming proof that Kyles was the murderer." *Id.* at 451, 115 S.Ct. 1555.

The evidence in this case is completely different. While Brown argues the allegedly exculpatory value of the evidence developed at the evidentiary hearing, he cannot account for the overwhelming physical evidence tying him to the crime: the trail of blood leading from the Chalflinches' apartment to his own, the distinctive knife used in the crime, and his ring found underneath the victim's liver. The testimony from the evidentiary hearing does not cast doubt on the finding of guilt given that the overwhelming physical evidence inculpates Brown as the perpetrator of these crimes.

■ Brown is surely correct that the prosecutor in this case unethically and improperly withheld evidence from the defense. Brown's strongest argument for relief is based on the premise that the prosecutor's unethical behavior should not go unpunished, and that granting Brown a writ of habeas corpus might serve as the prosecutor's appropriate punishment. But however reprehensible we may find the actions of the prosecutor, the focus of a *Brady* claim is not on him, but rather on the character of the evidence that he has withheld. The Supreme Court made this point clear in *United States v. Agurs:*

Nor do we believe the constitutional obligation is measured by the moral culpability, or the willfulness, of the prosecutor.... If the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor.

*United States v. Agurs,* 427 U.S. 97, 110, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) (footnote omitted).

Considering the evidence which Brown could have introduced at trial, had he known of its existence, and disregarding the bad faith of the prosecutor in denying him access to it, we believe it is not "material" evidence—it is not reasonably probable that had the evidence been introduced at trial, it would have resulted in a different verdict. Brown's *Brady* claim, therefore, must fail.

### B.

▮▮▮▮ Brown argues that several actions by the prosecutor deprived him of his Sixth Amendment right to the effective assistance of counsel. This is not a typical Sixth Amendment ineffective assistance of counsel claim that falls under the familiar *Strickland v. Washington* analysis. In a typical Sixth Amendment claim, a habeas petitioner must demonstrate specific errors of his trial counsel that undermine the reliability of a guilty verdict or a sentence of death. Brown cannot make such a claim because his trial counsel, James Van Camp, performed at an extremely high level of competence, and it is undisputed that Van Camp is the most skilled and experienced capital defense lawyer in his part of the state. *J.A.* at 548. Rather, Brown argues that the misconduct of the *prosecutor* rendered his trial so fundamentally unfair that it was essentially impossible for any counsel to render effective assistance on his behalf.

▮▮▮▮ Brown relies on the framework of the Supreme Court's decision in *United States v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). In *Cronic,* the Court observed that "there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt." *Id.* at 659 n. 26, 104 S.Ct. 2039. An exception exists, however, "on some occasions when although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." *Id.* at 659–60, 104 S.Ct. 2039 (citing *Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932)). The Court suggested that the complete denial of counsel and counsel that actively represented conflicting interests would be examples of such occasions. *See Cronic,* 466 U.S. at 659 & 661 n. 28, 104 S.Ct. 2039. This is an extremely high showing for a criminal defendant to make and, in *Cronic* itself, the Court held that although trial counsel in Cronic's mail fraud prosecution was given only 25 days to prepare for trial, counsel was inexperienced in criminal matters, the charges against Cronic were complex, and that some witnesses were not easily accessible, this set of events did *not* constitute a Sixth Amendment violation absent a showing of actual ineffectiveness.

Apart from evidence of the prosecutor's misconduct that was developed at the evidentiary hearing on remand, we know that the prosecutor in this case also denied defense counsel's request to have access to, and be allowed to inspect, the crime scene. In our previous decision, we rejected Brown's argument that the prosecutor's refusal to allow access to the crime scene rose to the level of constitutional error. *See Brown,* 891 F.2d at 495. We suggested, however, that Brown might develop testimony at the evidentiary hearing that could cause the district court to make a different determination as to the prejudice occasioned by the prosecutor's misconduct. *See Brown,* 891 F.2d at 495 & 495 n. 10 (finding no error, but "leaving out of the picture" any new evidence that could be developed). Brown argues in this appeal that we should reconsider our previous ruling in light of the new evidence that he developed in the evidentiary hearing.

It is undisputed that the prosecutor denied Brown's counsel access to the crime scene and that had such denial carried with it a

reasonable probability of a different outcome in the proceedings, it would have been error requiring a new trial. *See Brown,* 293 S.E.2d at 578 (finding, under the particular facts of this case, "a denial of fundamental fairness and due process for [Brown] to be denied . . . a limited inspection of the premises of the crime scene" but holding such error harmless because of the "overwhelming evidence of [Brown]'s guilt"). However, as we discussed above, *see supra* section III–A, the testimony developed at the evidentiary hearing (regarding the testimony of Squires, Pate, and Harding) does not rise to the level of a constitutional violation, and it therefore provides no occasion for us to reconsider our previous ruling in this case.

We previously held that the denial of access to the crime scene was not prejudice "of a sufficient magnitude to give rise to the presumption that the adversarial process broke down." *Brown,* 891 F.2d at 495 (quotation omitted). Even considering this issue together with the issues raised in Brown's first argument, *see supra* section III–A, the alleged errors must still meet the high threshold that it is "reasonably probable" that introduction of the evidence withheld by the prosecutor would have changed the result of the trial. *See Kyles,* 514 U.S. at 434, 115 S.Ct. 1555. Considering all of Brown's allegations *in toto,* we believe the physical evidence of his guilt (his ring, the palmprint on the bedroom wall, the blood in his apartment, and the distinctive inscription of the knife) is too overwhelming to say that introduction of the newly discovered evidence, together with evidence that might have been obtained by defense counsel viewing the crime scene, would have changed the outcome of either the guilt or penalty phases of Brown's trial.

### C.

■ At the penalty phase of the trial, the State called Brown's pre-trial cellmate, Roy Brown, to testify that David Brown had confessed to him in their cell that he had committed the murders. Brown, the appellant, claims that allowing the State to introduce this confession at the penalty phase, when it did not introduce it during the guilt phase, violated his rights under the Eighth and Fourteenth Amendments.

The North Carolina Supreme Court rejected this claim on direct appeal. The court held that the confession was probative evidence to rebut the evidence submitted by Brown at the guilt phase of the trial that would support mitigating circumstances. *See Brown,* 293 S.E.2d at 587–88. In his brief, Brown cites no case to support his argument that allowing this testimony at the penalty phase violated his right to due process. Indeed, precedent would suggest that admission of his confession did not violate his right to due process:

> [T]he Constitution does not prohibit consideration at the sentencing phase of information not directly related to either statutory aggravating or statutory mitigating factors, as long as that information is relevant to the character of the defendant or the circumstances of the crime.

*Barclay v. Florida,* 463 U.S. 939, 967, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (Stevens, J., concurring).

The lack of precedent to support Brown's claim makes it clear that even if we agreed with Brown that admission of his confession during the penalty phase violated his right to due process, such a decision would be a "new rule" that is forbidden by *Teague. See Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). Regardless of the merits of the claim, the State is correct that the claim is barred by *Teague* and Brown offers no argument, nor can he, that his proposed rule would fall within one of the two *Teague* exceptions. *See Teague,* 489 U.S. at 307–10, 109 S.Ct. 1060.

### IV.

For the reasons articulated above, the district court correctly denied Brown's petition for a writ of habeas corpus. The judgment is therefore affirmed.

*AFFIRMED.*