**Brady George SPICER, Petitioner,**

v.

**WARDEN OF THE ROXBURY CORRECTIONAL INSTITUTE,**
**Respondent**

**and**

**The Attorney General for the State of Maryland, Respondent.**

**No. CIV. PJM 97–2295.**

United States District Court,
D. Maryland.

Dec. 29, 1998.

**512**

· Jonathan Paul Van Hoven, Baltimore, MD, Brady George Spicer, R.C.I., Hagerstown, MD, for Petitioner.

J. Joseph Curran, Jr., Ann N. Bosse, David Jonathan Taube, Office of Attorney General, Baltimore, MD, for Respondent.

## OPINION

MESSITTE, District Judge.

### I.

Brady Spicer asks the Court to vacate his state court criminal conviction pursuant to 28 U.S.C. § 2254. Since his petition was filed after April 24, 1996, the effective date of the Anti–Terrorism and Effective Death Penalty Act of 1996, review is governed by 28 U.S.C. § 2254(d). *See Lindh v. Murphy*, 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).

Section 2254(d) provides that:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

In the Court's view, the decision of the State post-conviction courts involved an unreasonable application of clearly established Supreme Court law and an unreasonable determination of the facts in light of the evidence presented. Accordingly, the writ of habeas corpus will issue.

The Court explains.

### II.

On February 22, 1990, between 11:00 a.m. and noon, Francis "Bones" Denvir was viciously beaten in the upstairs office of Armadillo's, the bar he owned near the Annapolis docks. Brady Spicer is serving a 30–year sentence in the Roxbury Correctional Institute for having committed the crime. In May, 1992, an Anne Arundel County jury found him guilty of assault with intent to murder Denvir.[1] His motion for a new trial, direct appeal, and petition for post-conviction relief in the Maryland Courts were unsuccessful.

Spicer's conviction was based exclusively on eyewitness testimony, none of which came from the victim, who was unable to identify his assailant. At his trial, which occurred 27 months after the event, three witnesses identified Spicer as the culprit.

The first, Henry Connick, a bartender at Armadillo's, who did not know Spicer previously, testified that he came upon Spicer and Denvir as Denvir was being beaten, chased Spicer down the street but was unable to catch him.

The second eyewitness, Larry Brown, who indicated that he knew Spicer from "around" for a period of about 2 weeks prior to the incident, testified that he saw Spicer at the time of the incident running up the street being chased by another man.

The third witness, Sam Novella, who was standing in the street and had a glimpse of a man being chased about the time of the incident, when asked in court if Spicer was the man he had seen, testified that Spicer looked "very, very familiar."

---

1. Spicer was also convicted of the lesser offenses of assault with intent to maim, assault and bat-tery, and assault, which merged in the greater charge.

No other direct or circumstantial evidence linked Spicer to the crime and he had no apparent motive to commit it. A large pile of money was found beside Denvir when his assailant fled.

Although the Assistant State's Attorney told the jury in opening statement that Connick had made a "positive" out-of-court identification of Spicer from a photographic array, Connick in fact had originally told the prosecutor he was "almost positive."

The second witness, Brown, had been granted a plea bargain to testify against Spicer. Facing his third conviction on drug charges, Brown stood to receive a sentence of up to 20 years incarceration but could receive probation if he helped incriminate Spicer.

The third witness, Novella, had been unable to make a definite out-of-court identification from a photo array, although he had initialled a photograph of Spicer as possibly being the culprit.

All these facts were known to court-appointed defense counsel prior to trial. Certain other facts were not known to defense counsel prior to trial or, if known, were not acted upon.

Thus defense counsel knew that Connick, the first witness, had described the assailant to the police immediately after the attack as being a black male, approximately 5'9" tall, weighing about 165 pounds. At the end of his brief interrogation of Connick, defense counsel inquired if that was indeed what Connick had reported and, after Connick confirmed that was what he had said if that was what was written down, counsel inquired no further. Spicer, a black male, is apparently 6'3" or 6'4" tall and weighs in excess of 200 pounds. Spicer did not testify at trial nor was he asked to stand and demonstrate his size and bulk to the jury.

Defense counsel also knew that the second witness, Brown, had approached the prosecutor through his own attorney, Gary Christopher, who had told the prosecutor that Brown was able to identify Spicer as the perpetrator of the crime. What defense counsel did not know and what the prosecution did not disclose to him was that Brown's attorney had not told the prosecutor that his client saw Spicer on the day of the crime, only that Brown had seen Spicer a few days before and a few days after the crime. Before the grand jury and at trial, however, Brown was permitted to testify that he had been at work in the vicinity on the day of the crime and that he had in fact seen Spicer running away from the scene being chased by another man. The prosecutor never bothered to clarify the discrepancy between what Brown's attorney told him Brown would say and what Brown himself (in the absence of his counsel) told the prosecutor, the grand jury, and trial jury. Defense counsel, for his part, never inquired of Brown's counsel prior to trial as to what Brown might say, merely acting upon the prosecutor's representation of what Brown would say, *i.e.* that Brown saw Spicer being chased on the day of the assault. Defense counsel never interviewed Brown's employer regarding his attendance at work on the date of the crime.

The third witness, Novella, who had been unable to make a definite out-of-court identification of Spicer, testified at trial that Spicer looked "very, very familiar." Novella was permitted to testify to this effect without objection by defense counsel despite the fact that an objection would almost certainly have precluded the testimony altogether. Specifically, a hearing on Spicer's motion to suppress out-of-court identifications had been held immediately prior to the commencement of the trial on the merits. Novella failed to show up for the hearing, in consequence of which the State advised both the court and defense counsel that it did not intend to call Novella at trial. Accordingly, no record was made before trial of what Novella's testimony might be and no groundwork laid for his possible impeachment were he to testify. In fact Novella not only showed up for trial later that day; despite the fact that the court had imposed a rule on witnesses, he sat in the courtroom through the initial part of the trial proceedings before being called as a witness. When Novella was called by the prosecution in its case-in-chief, defense counsel raised no objection nor did he object to Novella's in-court identification of Spicer as looking "very, very familiar."

Finally, Spicer had advised his counsel that some 17 months prior to the crime for which he was on trial, he fractured his knee cap as a result of which, according to Spicer, he was unable to run in the fashion that the assailant was supposed to have run while being chased. Although defense counsel had Spicer's medical record in his possession, he neither offered the record in evidence nor called any doctor or expert to testify to the effect that the injury might have had on Spicer's ability to run. Counsel explained to Spicer at the time that he was not disposed of to offer the medical record in evidence because it would make the defense case seem "desperate."

Against this background, the jury found Spicer guilty beyond a reasonable doubt of assault with intent to murder. He has been incarcerated ever since. Throughout, he has vigorously maintained his innocence.

### III.

Spicer argues that his conviction is tainted for several reasons:

1) The Assistant State's Attorney for Anne Arundel County committed a *Brady*[2] violation by failing to disclose the inconsistent statement made by State's witness Larry Brown.

2) He was denied effective assistance of counsel because counsel failed to investigate the inconsistent statement made by Brown.

3) The Assistant State's Attorney engaged in prosecutorial misconduct by calling Sam Novella after Novella failed to appear at the suppression hearing and the State represent to counsel and the court that it would not be calling him and after Novella violated the court's rule on witnesses.

4) Spicer was denied effective assistance of counsel because counsel failed to object to Novella's testimony after Novella failed to appear at the suppression hearing and the State represented to defense counsel and the court that it would not be calling him and

after Novella violated the court's rule on witnesses.

5) He was denied effective assistance of counsel because counsel failed to investigate with Brown's employers whether Brown was at work in the vicinity of the crime on the day the crime occurred.

6) He was denied effective assistance of counsel because counsel failed to enter into evidence medical records or medical or expert testimony showing that Spicer was unable to run as the assailant was described to have done.[3]

### IV.

■ A state prisoner may not seek habeas corpus relief without having first exhausted his state remedies. *See* 28 U.S.C. § 2254(b-c); *Brown v. Allen*, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953). When state post-conviction processes are available with regard to a claim not previously raised in state court—*e.g.* a claim of a *Brady* violation or one of ineffective assistance of counsel—exhaustion of those processes is required. *See e.g. Spencer v. Murray*, 18 F.3d 237 (4th Cir.1994); *Pruett v. Thompson*, 996 F.2d 1560 (4th Cir.1993). If relief is denied in the state post-conviction trial proceeding, an appeal must be taken to the state appellate courts in the manner prescribed by state law. In the present case, the State concedes that, whether or not Spicer presented each of his claims to appropriate state courts, he no longer·has any state direct or collateral review remedies available to him with respect to the claims raised in this Court. Accordingly the Court need not tarry upon the exhaustion issue.

### V.

■ Subject to few exceptions, where a habeas petitioner has failed to present the state courts with the federal claim or claims raised in his habeas petition, the federal habeas court will not consider the procedurally

---

**2.** *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

**3.** Grounds 2, 3, 5 and 6 were raised by Spicer in his pro se petition at the commencement of the case. After a preliminary review of the record,

the Court determined that Spicer ought to have counsel appointed to help him articulate his grounds with greater precision. Counsel responded by raising grounds 1 and 4.

defaulted claim. *Gray v. Netherland,* 518 U.S. 152, 161–66, 116 S.Ct. 2074, 135 L.Ed.2d 457 (1996). A procedurally defaulted claim will preclude federal review "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson,* 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).

■ In these proceedings, the State argues with regard to the allegation that the prosecutor improperly failed to disclose the prior inconsistent statement of Larry Brown that the claim is procedurally defaulted. The Court disagrees. In the first place, in his Supplemental Petition for Relief under the Uniform Post–Conviction Procedure Act, Brown's inconsistent statements are clearly alluded to in the context of Spicer's ineffective assistance claim. More to the point, post-conviction trial court counsel noted in a footnote to the petition that:

Had proper inquiries been made by trial counsel, petitioner would have been in a better position to further determine whether there was a discovery violation by the State as well. *See* Maryland Rule 4–263(a) and *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

The post-conviction trial judge specifically discussed Brown's inconsistent statements as they related to a possible *Brady* violation, holding that there was no *Brady* violation because the evidence was not exculpatory merely a "potential discrepancy," presumably useful only for impeachment purposes.

Indeed, the State concedes that the claim of prosecutorial misconduct as to Brown's statements was clearly raised at the circuit court level, but argues that Spicer failed to carry the issue to Maryland Court of Special Appeals. In this Court's view, however, Spicer's pro se Application for Leave to Appeal to the Court of Special Appeals made suffi-

cient reference to the issue. In it, the context of arguing ineffective assistance of counsel, Spicer argued that:

Counsel should have at a minimum questioned Brown's attorney Gary Christopher as to exactly what Brown had told him . . . so if any inconsistent statements were made counsel could have challenged them.

He also argued generally that:

The State failed to provide discovery as mandated by Md. Rule 4–263 i.e., the State had statements made by witnesses and failed to provide trial counsel with them. Which was suppression of exculpatory evidence. (Sic).

In its extremely terse post-conviction opinion dated February 5, 1997,[4] the Court of Appeals acknowledged that among the issues before it were these. That:

(1) The hearing judge erred by failing to consider various Fifth, Sixth and Fourteenth Amendment rights violations; [and that]

(2) The State failed to present discovery.

In this Court's view, it is fair to conclude that among the discovery violations the Court of Special Appeals considered was the State's failure to disclose Brown's prior inconsistent statement to the defense. The issue, in other words, was presented sufficiently "face-up and squarely"; it was not "easily lost in the sheer numerosity of petitioner's claims." *Mallory v. Smith,* 27 F.3d 991, 995 (4th Cir.1994), cert. denied, 513 U.S. 1047, 115 S.Ct. 644, 130 L.Ed.2d 549 (1994). Spicer fairly articulated the facts and constitutional theory relative to the nondisclosure of Brown's inconsistent statement. *See Anderson v. Harless,* 459 U.S. 4, 6–7, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982); *Mallory,* 27 F.3d at 994–96. The Court finds no procedural default as to the *Brady* issue involving Brown's prior statement.

■ The State also argues that Spicer's allegation of ineffective assistance of counsel

---

4. Except for discussing remand on a point not relevant to the present petition, the sum and substance of the Court of Special Appeals discussion of the issues in the post-conviction appeal was this:

We have reviewed all of the allegations raised by the applicant. Except for the allegation relating to counsel's failure to subpoena two other witnesses, we find no merit in the allegations raised. The application as to those allegations is denied.

by reason of counsel's failure to challenge the testimony of Sam Novella is partially defaulted. It concedes that Spicer has preserved the issue of whether Novella's testimony was subject to exclusion based on his absence from the pre-trial suppression hearing and the prosecution's representation that he would not be called as a witness at trial. But the State claims that Spicer is procedurally barred from alleging that Novella violated the trial court's sequestration order when he sat in the courtroom prior to being called as a witness at trial.

Again, the State does not appear to contest that Spicer fairly raised the sequestration issue at the trial level in the post-conviction trial proceeding since Spicer testified at that time, without objection and without contradiction, to Novella's violation of the sequestration order and the state post-conviction judge, without acknowledging the basis of Spicer's argument, addressed in across-the-board fashion Spicer's contention that counsel had failed to object to Novella's testimony at trial. Here, too, what the State appears to be arguing is that Spicer failed to raise the sequestration issue in his Application for Leave to Appeal to the Maryland Court of Special Appeals. But Spicer's Application for Leave to Appeal manifestly indicated that one of the post-conviction issues covered by the application was counsel's failure to "object" to the testimony of and identification by Novella. The Application did not limit the grounds upon which defense counsel's failure to object was being challenged nor is there reason to suppose that the Court of Special Appeals, while summary in its disposition of the petition, failed to consider all the grounds raised by Spicer before the post-conviction trial court. This Court finds that Spicer's articulation of the sequestration issue was sufficiently precise for it to have been preserved for habeas purposes.

## VI.

■ Due process requires the prosecution to disclose to the defense all material exculpatory information in the state's possession, *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), including impeachment evidence. *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

A) State's witness Brown testified before the grand jury and at trial that he saw Spicer, on the morning of the crime, running from a man that he later found out was the bartender at Armadillo's. He also told the trial jury that some time later he had a conversation with Spicer in which Brown said, "Man they're trying to make me testify against you" and Spicer replied, "Don't even feed into that." According to Brown, "(t)hat's all that was said." Brown further told the jury that this was the information that he had related to his attorney, Gary Christopher.

At Spicer's post-conviction hearing, however, Brown's attorney Gary Christopher gave a sharply different account of what Brown had told him. Christopher testified that Brown had told him in the summer of 1990 that he knew about the Armadillo's case and that Christopher "made clear to him it was very important to ... present as much evidence as we could to the State in order to interest them in working out a deal." Christopher said that Brown told him he had been working at Market Place, a fish market down near the harbor, and that a person known to him as "Spicey" had approached him one day while he was working and started asking questions about Armadillo's that raised Brown's suspicions about Spicey's intentions. This included, according to Brown, inquiries by Spicey as to whether Brown knew anything about the man counting out the money in the upstairs office. Christopher said that Brown told him his next connection with the case came a day or two later when Brown heard that there had been an assault and an attempted robbery at Armadillo's. Brown told Christopher he did not see Spicey on the day of the robbery, but thereafter saw a composite sketch of the perpetrator which confirmed his suspicion that Spicey was the perpetrator. Then, according to Brown, a day or so later, Spicey approached him at the fish market and told him "thanks," which Brown understood to be an expression of gratitude for Brown's not disclosing their prior conversation.

Christopher further testified:

I pressed [Brown] for any further information he might have as to whether, you know, he saw Spicey the day of the offense or whether he could connect him any more closely to the offense and he could not.

Christopher emphasized that, having pressed Brown on this point, he had no doubt at all that Brown said he was not an eyewitness on the day of the crime. According to Christopher, "I pressed him on that, because . . . as far as I was concerned, what he told me was not enough to go the Grand Jury with" and Christopher told Brown that. Christopher testified that he also told Brown that "it would be very much to your benefit if you knew any other detail that could help . . . that could make the package more attractive, as it were ."

Christopher went on to say that he subsequently contacted Assistant State's Attorney Steven Sindler and told him that Brown could identify the perpetrator of the Armadillo's crime and that he would like to negotiate a plea for Brown as a cooperating witness. Sindler, as it happened, was also the Assistant State's Attorney prosecuting the State's drug case against Brown. Christopher made clear that in no way did he indicate to Sindler that Brown was an eyewitness to the crime, only that Brown had purportedly seen Spicer a few days before and a few days after the event.

At Spicer's post-conviction hearing, Sindler corroborated what Christopher said he told him about what Brown had told Christopher: That Brown had been working downtown, that Spicer had inquired about the Armadillo's incident, and that after the incident Spicer had a conversation in which he told Brown "thanks for being cool or what have you." Sindler acknowledged that Christopher had said nothing to him about Brown being an eyewitness on the day of the crime.

Sindler further conceded that in a later conversation he had with Brown in the absence of Christopher, Brown repeated what he "knew" about Spicer before and after the crime, but that Brown added a new fact— that "he [Brown] saw on the day of the incident Mr. Spicer run from Armadillo's and a white man followed him, chasing him."

According to Sindler:

I recall when Gary Christopher told me this information, I do recall at the time knowing that there was the part about the running away from Armadillo's was not said by Gary Christopher to me. Then I know that when I met with Larry Brown, he said that.

When asked by post-conviction counsel whether he felt there was any discrepancy between what Christopher had told him and what Brown had told him, Sindler replied:

Well, I recognized that what Mr. Christopher told me wasn't what Mr. Brown had told me, but I didn't think anything of it, because I didn't really pay much attention to what Mr. Christopher told me. . . . Because I knew that before I would act upon anything that a snitch would tell me, that I would speak to that person and know firsthand.

When asked why he did not pass along the fact of the discrepancy between Brown's two statements to Spicer's counsel, Sindler answered:

The first thing is that I didn't think that they were contradictory. I felt, one, the second comments directly from Brown contained the same comments that Christopher gave to me, and Brown had additional comments when he met with me in the office. Two, it was Gary Christopher's description of what his client might say and I wouldn't have gone forward on what his client might have said. I found out directly. So I discounted what Gary had said earlier to me, which seemed irrelevant.

If I was going to talk to Larry Brown myself personally, then I would base what . . . Brown might testify to . . . upon my own conversations with me by firsthand knowledge.

And Sindler further said:

At the time I didn't think it significant because I didn't really listen too much to what Gary had said, only to the extent to know that what he said was useful in the case.

But as to there being a contradiction, I didn't perceive it as that. As to there being anything about that would require me to disclose it, I' didn't think that—I still don't think that there was a contradiction or that evidence really provided anything that was exculpatory in nature and I should disclose it.

I was talking about what one person had said and what another person had said and I didn't think it was necessary for me to disclose to the defense a prior contradictory statement when there wasn't actually that person making two statements.

B) The State argues that the post-conviction trial court found that there was only "a potential discrepancy between what Brown's attorney indicated Brown knew and what Brown actually told the prosecutor" and thus no *Brady* violation. It urges this Court to accept the post-conviction court's finding as presumptively correct pursuant to 28 U.S.C. § 2254(e)(1). The State further argues, citing *United States v. Capers*, 61 F.3d 1100, 1103–04 (4th Cir.1995), cert. denied 517 U.S. 1211, 116 S.Ct. 1830, 134 L.Ed.2d 935 (1996), that because Christopher's knowledge was not within the State's possession, the State was neither able nor obligated to divulge that knowledge to the defense. Finally, the State argues that in the *Brady* context, with regard to nondisclosed material, there must be "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *See Kyles v. Whitley*, 514 U.S. 419, 433–34, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (citing *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). According to the State, the "difference between Christopher's proffer and Brown's testimony was of scant impeachment value, because so far as Sindler was concerned, the difference could have been attributable to some decision or lapse by Christopher."

The Court considers these arguments.

■ C) Before all else, it should be clear that no presumption of correctness is due the post-conviction trial court's finding that there was only a "potential discrepancy" between Christopher's proffer and Brown's testimony

or its finding that the discrepancy was not "material." These are not historical facts but rather mixed conclusions of law and fact as to which the habeas court may make de novo findings. *Miller v. Fenton*, 474 U.S. 104, 113–14, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985); *Fields v. Murray*, 49 F.3d 1024, 1029–32 (4th Cir.) (en banc), cert. denied 516 U.S. 884, 116 S.Ct. 224, 133 L.Ed.2d 154 (1995); *Davis v. Heyd*, 479 F.2d 446, 451 (5th Cir.1973).

■ Indeed, the Court concludes that the discrepancy between what Christopher told the State's Attorney Brown would say and what Brown in fact told the State's Attorney was actual not merely potential and in addition was highly material. Between the time of Christopher's proffer and Brown's encounter with the State, Brown transformed himself into an eyewitness to the crime. There is no "potential" discrepancy or immateriality where a witness who earlier professes not to have been eyewitness to a crime later remembers himself to have been such. In *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), the Supreme Court had this to say about a witness who testified at trial that he saw the defendant struggling with one of victims:

> Smallwood's statement taken at the parking lot, however, was vastly different. Immediately after the crime, Smallwood claimed that he had not seen the actual murder and had not seen the assailant outside the vehicle.

514 U.S. at 442, 115 S.Ct. 1555.

The Court concluded that "a jury would reasonably have been troubled by the adjustments to Smallwood's original story by the time of the second trial." *Id.* at 443, 115 S.Ct. 1555. As the Court observed, "[t]hese developments would have fueled a withering cross-examination, destroying confidence in Smallwood's story and raising a substantial implication that the prosecutor had coached him to give it." *Id.* at 443, 115 S.Ct. 1555.

The same is no less true of Brown's testimony in the present case.

As for whether Christopher's knowledge was within the State's possession and capable

of disclosure, certainly the prosecution knew that Christopher never told him that Brown was an eyewitness to the crime and that Brown, in the absence of counsel, later told him that in fact he was. The prosecution had every reason to realize that Brown—to a virtual certainty—was fabricating the testimony that he was an eyewitness if indeed anything Brown was saying was truthful. This was not general information pertaining to the potential impeachability of a witness based on his truthfulness as to other matters in his past. The discrepancy involved truth-telling going to the very event that was the subject of the criminal prosecution. For the prosecution to suggest that there was nothing contradictory between the statement Brown made to the prosecution as opposed to the statement Brown's attorney said Brown would make is to ask for a blessing that a prosecutor may wilfully blind himself to the obvious reality of his circumstances, an argument dependent on the proposition that the prosecution must always in fact know that testimony is perjured before a due process deprivation will be found. This distinctly is not the law.

■ In *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the Supreme Court made clear that if a prosecutor knows or "should have known" about perjured testimony, the knowledge is sufficient.[5] Assuming the Court is obliged to accept the post-conviction court's factual determination that the prosecutor did not in fact know of the perjury, this Court, going one step further, finds that the prosecutor should have known of it, another finding of mixed law and fact the Court reaches de novo.

■ Citing *Kyles v. Whitley, supra,* the State's final argument on the *Brady* issue is that Spicer is unable to demonstrate "a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different." 514 U.S. at 433–34, 115 S.Ct. 1555. Assuming *Kyles* provides the applicable standard,[6] the Court finds that such a reasonable probability exists.

In *Kyles*, the Supreme Court's most recent elaboration of *Brady* line of cases, the Court stressed four aspects of materiality under *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

First, with regard to "reasonable probability," the Court pointed out that "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434, 115 S.Ct. 1555. The Court went on to say that "a reasonable probability" of a different result is shown "when the Government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Id.* at 434, 115 S.Ct. 1555 (citing *Bagley*, 473 U.S. at 678, 105 S.Ct. 3375).

The second aspect of materiality under *Bagley* is that "[a] defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Id.* at 434–35, 115 S.Ct. 1555. The key to demonstrating the *Brady* violation is "showing that the favorable evidence could reasonably be taken to put the whole

---

**5.** As well as having a legal obligation, the prosecutor had an ethical obligation to determine the accuracy of Brown's testimony. *See United States v. Kelly*, 543 F.Supp. 1303 (D.Mass.1982). But the constitutional obligation is not measured "by the moral culpability, or the willfulness, of the prosecutor ... If the suppression results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor." *U.S. v. Agurs*, 427 U.S. 97, 110, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

**6.** Arguably the standard applicable to perjured testimony applies. *See Mooney v. Holohan*, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935);

*United States v. Kelly*, 35 F.3d 929 (1994). Again, a prosecutor is held to know of perjury if he "should have known" of its existence, which the circumstances strongly indicate was the case here. *United States v. Agurs, supra*. By this standard, "[e]ven if the false testimony relates only to the credibility of a Government witness and other evidence has called that witness' credibility into question, a conviction must ben reversed when there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Kelly*, 35 F.3d at 933 (quoting *Agurs*, 427 U.S. at 103, 96 S.Ct. 2392).

case in such a different light as to undermine confidence in the verdict." *Id.* at 435, 115 S.Ct. 1555.

Third, the Court held that once a *Bagley* error has been found, there is no need for further harmless error review. *Id.*

Fourth and finally, the *Kyles* Court indicated that "*Bagley* materiality" is defined in terms of suppressed evidence considered collectively, not·item-by-item. *Id.* at 436, 115 S.Ct. 1555.

On the facts of *Kyles,* the Court concluded that "disclosure of the suppressed evidence to competent counsel would have made a different result reasonably probable." *Id.* at 441, 115 S.Ct. 1555.

It quoted the district court to the effect that "'the essence of the State's case' was the testimony of eyewitnesses." *Id.* at 441, 115 S.Ct. 1555. The Court then pointed out that "[d]isclosure of their statements would have resulted in a markedly weaker case for the prosecution and a markedly stronger one for the defense. To begin with, the value of two of those witnesses would have been substantially reduced or destroyed." *Id.*

To refer again to a passage of striking applicability to the present case, the Supreme Court in *Kyles* pointed out that one of the witnesses had testified that Kyles was the assailant and that the witness had seen him struggle with one of the victims. The Court observed:

Smallwood's statement taken at the parking lot, however, was vastly different. Immediately after the crime, Smallwood claimed that he had not seen the actual murder and had not seen the· assailant outside the vehicle.

514 U.S. at 442, 115 S.Ct. 1555.

Again, the Court concluded that "a jury would reasonably have been troubled by the adjustments to Smallwood's original story by the time of the second trial." *Id.* at 443, 115

S.Ct. 1555. And again, as the Court observed, "[t]hese developments would have fueled a withering cross-examination, destroying confidence in Smallwood's story and raising a substantial implication that the prosecutor had coached him to give it." *Id.* at 443, 115 S.Ct. 1555.

The Court then proceeded to discuss the unreliability of eyewitness testimony in general, declaring that "the effective impeachment of one eyewitness can call for a new trial even though the attack does not extend directly to others." *Id.* at 445, 115 S.Ct. 1555. *See also Brown v. French,* 147 F.3d 307, 312 (4th Cir.1998) (distinguishing *Kyles* because "'the essence of the State's case [in *Kyles*] was the testimony of eyewitnesses, who identified Kyles as [the] killer,'" 147 F.3d at 312 (quoting *Kyles,* 514 U.S. at 441, 115 S.Ct. 1555).

Finally, the *Kyles* court, as the Fourth Circuit recognized in *Brown,* "relied on the fact that apart from the testimony of eyewitnesses, 'the physical evidence ... would, by the State's own admission, hardly have amounted to *overwhelming* proof that Kyles was the murderer.'" *Brown,* 147 F.3d at 312 (citing *Kyles,* 514 U.S. at 451, 115 S.Ct. 1555) (Emphasis added).

Kyles' conviction, accordingly, was overturned. The present case, in this Court's view, fits squarely within the mold of *Kyles.*

Here, three "eyewitnesses" and nothing more linked Spicer to the crime. There were no fingerprints, no physical evidence, no motive.[7]

One of the two witnesses, Connick, had made a fairly positive pre-trial identification of Spicer from a photo array and, to be sure, a positive in-court identification. But Connick had also told the police right after the crime that the perpetrator was perhaps 5'9" tall and weighed about 165 pounds whereas Spicer was 6'3" or 6'4" tall and weighed some 200 pounds.[8] The other remaining witness,

---

7. Indeed—for what it is worth—there appears to be a rather broadly held view in the Annapolis Police Department that Spicer was not the perpetrator of the crime.

8. The Supreme Court in *Kyles* noted the problematic nature of discrepant descriptions of appearances such as this:

The State rated Henry Williams as its best witness, who testified that he had seen the struggle and the actual shooting by Kyles. The jury would have found it helpful to probe this

Sam Novella, was unable to make a positive pre-trial identification, but was able to testify at trial that Spicer looked "very, very familiar."

It is of course possible that the jury might have convicted Spicer on the testimony of Connick and Novella alone, although as will be discussed below, Novella's testimony should have been excluded altogether. But that is not the constitutional test. As the Supreme Court stated in *Kyles*, "defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." 514 U.S. at 434–435, 115 S.Ct. 1555. And, again, "the effective impeachment of one eyewitness can call for a new trial even though the attack does not extend directly to others." *Id.* at 445, 115 S.Ct. 1555. Connick had never seen the perpetrator before allegedly coming upon him in flagrante, whereas Brown testified he knew Spicer from before. Thus, although the State may now attempt to minimize Brown's role in the trial, it is clear he was offered as a key eyewitness to the crime and there is every reason to suppose that because of coincidences between his testimony and that of Connick and Novella, Brown's testimony added significant weight to the jury's conclusion that Spicer was guilty beyond a reasonable doubt. Given Brown's other obvious vulnerabilities—including his generous plea bargain (5 versus 20 years)—it is quite probable that impeachment of him on the basis of his prior inconsistent statement would have exploded his testimony altogether. It might well also have demonstrated a fatal weakness in the State's overall case, since one of its key witnesses would have been exposed as a perjurer.

The Court concludes, following *Kyles/Bagley*, that the verdict in this case was not "worthy of confidence," *Kyles*, 514 U.S. at 434, 115 S.Ct. 1555, and that a "reasonable probability [existed] that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." [9] *Bagley*, 473 U.S. at 682, 105 S.Ct. 3375.

The Court holds that the State post-conviction court's finding of no *Brady* violation was a decision involving an unreasonable application of clearly established federal law as determined by the Supreme Court.

VII.

A.) *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) establishes the standards for a court's review of whether trial counsel has rendered effective assistance within the meaning of the Sixth Amendment. *See, e.g., Matthews v. Evatt*, 105 F.3d 907, 919 (4th Cir.1997), cert. denied —— U.S. ——, 118 S.Ct. 102, 139 L.Ed.2d 57 (1997). Under *Strickland*, a state prisoner claiming ineffective assistance rendering his conviction invalid must show (1) that "counsel's representation fell below an objective standard of reasonableness" and (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 688–94, 104 S.Ct. 2052. As to the first prong, the Court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690, 104 S.Ct. 2052. All circumstances must be considered. *Id.* at 688, 104 S.Ct. 2052. The court is directed to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," as "[t]here are countless ways to provide effective assistance in a given case" and "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Id.* at 689, 104

---

conclusion in the light of Williams's contemporaneous statement, in which he told the police that the assailant was "a black male, about 19 or 20 years old, about 5'4" or 5'5", 140 to 150 pounds, medium build" and that "his hair looked like it was platted." App. 197. If cross-examined on this description, Williams would have had trouble explaining how he could have described Kyles, 6-feet tall and thin, as a man more than half a foot shorter with a medium build. Indeed, since Beanie was 22 years old, 5'5" tall, and 159 pounds, the defense would have had a compelling argument that Williams's description pointed to Beanie but not to Kyles. [Footnotes omitted] 514 U.S. at 441.

9. Spicer's claim of prosecutorial misconduct as to Novella's testimony will be discussed *infra*.

522

S.Ct. 2052. Thus "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of· counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* To prevail, the state prisoner "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound tactical strategy.'" *Id.* at 689, 104 S.Ct. 2052 (citing *Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)).

Moreover, even if counsel commits an unreasonable error, "the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. As the Supreme Court held in *Lockhart v. Fretwell,* "an analysis focusing solely on mere outcome determination, without ·attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective." 506 U.S. 364, 369, 113 S.Ct. 838, 122 L.Ed.2d 180 ·(1993). The prejudice component· under *Strickland,* "focuses on the question whether ·counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." No unreliability or unfairness will be found where counsel's ineffectiveness "does not deprive the defendant of any substantive or procedural right to which the law entitles him." *Id.* at 372, 113 S.Ct. 838.

B.) As to Spicer's claims of ineffective assistance, the State argues that the post-conviction court concluded that none of those claims satisfied the *Strickland* standard and that the post-conviction court's decision may not be overturned unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

C.) The Court concludes· that the post-conviction court's decision regarding at· least one aspect of trial counsel's behavior was contrary to or involved an unreasonable application of clearly established federal law as determined by the Supreme Court.

1.) Spicer's trial counsel had moved pre-trial to suppress all eyewitness identifications. He had specifically requested the opportunity to question Sam Novella, who was in the alley between two buildings on the day of the crime and who saw the culprit being chased, even if briefly. When Novella failed to show up at the suppression hearing, the State specifically indicated to the court and counsel that Novella would not be called to testify at trial.

During the State's case, however, the Assistant State's Attorney apparently directed his investigator to try and find Novella and he in fact was found. According to Spicer's uncontradicted testimony at the post-conviction hearing, Novella entered the courtroom after the lunch recess and remained there during the testimony of another State's witness in violation of the trial court's rule on witnesses.

When the State called Novella as a witness at trial, no objection was raised by defense counsel. Novella then proceeded to testify that he had witnessed the chase and that during the investigation had been shown several photographs, including one of Spicer. Although he had been unable to identify Spicer positively, he had put his initials on the back of the Spicer photo as a possible suspect. He then proceeded to tell the jury that, on the basis of their in-Court encounter, Spicer looked "very, very familiar." Defense counsel made no objection to the in-court identification.

There appears to be little question that, had defense counsel objected to Novella's testimony, he would not have been permitted to testify. At the post-conviction hearing, defense counsel defended his decision not to object to Novella's testimony as a "technical decision," because he believed Novella's identification would be "weak." Indeed, the post-conviction court concluded that the decision not to call Novella "was a tactical decision founded on (trial counsel's) belief that Novella's identification was weak and would indicate desperation on the part of the prosecution." This purported justification borders on the absurd.

The Court recognizes that the decision to object to the testimony of certain witnesses

523

may well be a tactical decision not fairly open to post-hoc dissection. An otherwise objectionable witness can help as well as hurt a defendant's case. But in the present case, the trial counsel's reasons and those of the post-conviction court are nothing short of baffling. A simple objection to any testimony by Novella would almost certainly have blocked his appearance altogether. There would have been no reference to the earlier photo array and certainly no face-to-face declaration that Spicer looked "very, very familiar."

Once again, the case against Spicer was built entirely on eyewitness testimony. Failing to prevent one of the three eyewitnesses from testifying altogether—a virtually certain outcome—after not having probed that witnesses' testimony at a pre-trial suppression hearing was indefensible. Any objection to Novella's testimony could have been made outside the presence of the jury so that Spicer's so-called "desperation" would never have been witnessed by it. Beyond that, as of the time of the trial, it is difficult to gainsay the fact that Spicer's case, in which he was not going to testify or offer any evidence of his own, was already firmly set in a "desperate" posture.

The Court concludes, under the circumstances, that defense counsel's failure to object to the Novella testimony fell short of an objective standard of reasonableness and but for that the result of Spicer's proceeding would have been different. In consequence, the result at trial was unreliable. The State post-conviction court's determination that defense counsel did not render ineffective assistance violated standards clearly enunciated by the Supreme Court.

■ 2.) Trial counsel also had in his possession medical records which showed that approximately 17 months prior to the alleged incident, Spicer had fractured his knee. Spicer had told counsel that he was unable to run in the fashion that the assailant in this case had been described as doing. Over Spicer's objection, counsel chose not to introduce this evidence nor did he call any doctor or expert to testify whether Spicer was able

to run. Spicer himself was not called as a witness on this or any other point. The post-conviction court found that trial counsel had "made a tactical decision not to use (the records) because he felt that use of a two year old knee injury would indicate desperation by the defense." Although the court found defense counsel's omission on this point "troublesome," it went on to conclude that "no showing of prejudice was made on the point. No evidence was presented to indicate that the records established an inability to run."

Defense counsel's failure to pursue this line of evidence unquestionably presents a further occasion for puzzlement. This was first and foremost a reasonable doubt case built wholly on eyewitness testimony, "the vagaries of [which] are well known; the annals of criminal law [being] rife with instances of mistaken identification." *United States v. Wade,* 388 U.S. 218, 228, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). Any evidence tending to show Spicer was incapable of acting as the assailant supposedly did would be all to the good of the defense.

■ The Court, however, is obliged to weigh each allegation of ineffective assistance of counsel individually; it may not consider the derelictions collectively. *Fisher v. Angelone,* 1998 WL 850411 (4th Cir.). In light of that, the Court is unable to say, consistent with the *Strickland* standard, that but for counsel's error regarding Spicer's medical history, the result of the proceeding would have been different. The Court finds no ineffective assistance insofar as counsel's failure to present the medical records is concerned. For reasons previously discussed, however, the Court remains firmly convinced that Spicer's trial was constitutionally flawed.

VIII.

■ Based on the foregoing, the Court has determined to grant Spicer's Motion to Vacate with the directive that Spicer shall be retried within four months or that he be unconditionally released from custody.[10]

10. The rest of Spicer's claims may be dispatched summarily. None of them, in the Court's view, states a constitutional violation:

*WRIT OF HABEAS CORPUS*

For the reasons set forth in the accompanying Opinion, it is this 29th day of December, 1998

ORDERED that a Writ of Habeas Corpus is hereby ISSUED to Defendants Warden of the Roxbury Correctional Institute and J. Joseph Curran, Jr., Attorney General for the State of Maryland, and they are DIRECTED to retry Petitioner Brady Spicer within four months hereof for the offense or offenses he is alleged to have committed or to release him unconditionally from custody.

a) The State's decision to call Sam Novella as a witness did not constitute prosecutorial misconduct. Despite the State's representation that it would not call Novella, defense counsel could waive that right and that in effect is what he did. The matter of Novella's testimony is more properly addressed as part of the claim of ineffective assistance of counsel.

b) Defense counsel's failure to investigate and introduce evidence of Brown's prior inconsistent statement, as the post-conviction court held, did not fall below an objective standard of reasonableness. As that court held, "there was no basis for trial counsel to believe Brown had made any prior inconsistent statements in the first place." This issue is more properly addressed as part of the claim of prosecutorial misconduct.

c) Defense counsel's failure to investigate Brown's work records to determine whether he was in fact working on the day he said he witnessed the chase does not amount to ineffective assistance of counsel. The Court agrees with the post-conviction court that this failure may have been "deficient," but that the prejudice prong of *Strickland* is not satisfied. Counsel at the post-conviction hearing entered into a stipulation regarding Brown's work records which apparently showed the hours Brown worked during the month of the crime but not the days worked. There is no reason to suppose that an interview with Brown's employer 2½ years after the fact would have yielded any more precise information.

d) The contention that the investigation of this case was conducted by persons outside the regular police department implicates no violation of any law as far as the Court can see. There is no indication that police detectives possessed hard evidence exonerating Spicer as opposed to merely holding opinions that he did not commit the crime.