**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

ERIC DOMAIN GLOVER,
        *Petitioner-Appellee,*

v.

GERALDINE MIRO, Warden of
Allendale Correctional Institution;
CHARLES MOLONY CONDON, Attorney
General of the State of South
Carolina,

        *Respondents-Appellants.*

No. 00-7663

Appeal from the United States District Court
for the District of South Carolina, at Florence.
Matthew J. Perry, Jr., Senior District Judge.
(CA-97-1020-4-10-BE)

Argued: May 10, 2001

Decided: August 15, 2001

Before WILKINSON, Chief Judge, and WIDENER and
MICHAEL, Circuit Judges.

---

Reversed and remanded by published opinion. Chief Judge Wilkinson
wrote the opinion, in which Judge Widener joined. Judge Michael
wrote a dissenting opinion.

---

## COUNSEL

**ARGUED:** Tracey Colton Green, Assistant Attorney General,
OFFICE OF THE ATTORNEY GENERAL, Columbia, South Caro-

lina, for Appellants. Thadeous Herbert Westbrook, III, NELSON, MULLINS, RILEY & SCARBOROUGH, L.L.P., Columbia, South Carolina, for Appellee. **ON BRIEF:** Charles M. Condon, Attorney General, John W. McIntosh, Chief Deputy Attorney General, Donald J. Zelenka, Assistant Deputy Attorney General, OFFICE OF THE ATTORNEY GENERAL, Columbia, South Carolina, for Appellants. William C. Wood, Jr., NELSON, MULLINS, RILEY & SCARBOR-OUGH, L.L.P., Columbia, South Carolina, for Appellee.

---

**OPINION**

WILKINSON, Chief Judge:

This case addresses whether defendant Eric Glover received consti-tutionally ineffective assistance of counsel. The district court found that Glover had not proven actual prejudice under *Strickland v. Wash-ington*, 466 U.S. 668 (1984). It nevertheless granted a writ of habeas corpus to Glover under the per-se prejudice reasoning of *United States v. Cronic*, 466 U.S. 648 (1984). Because *Strickland v. Wash-ington*'s actual prejudice analysis applies to this case, and because Glover cannot prove actual prejudice under the *Strickland* test, we reverse the judgment of the district court and remand the case for fur-ther proceedings consistent with this opinion.

I.

On June 19, 1991, a South Carolina jury found Eric Glover guilty of numerous counts resulting from the January 22, 1991 kidnapping and robbery of Wayne Cooper. Based on Cooper's description of his assailant as well as other leads, police arrested Glover in Florida and returned him to South Carolina. A grand jury indicted him on five counts stemming from the January 22 incident — grand larceny, kid-napping, armed robbery, assault and battery with the intent to kill, and possession of a firearm during the commission of a violent crime.

Gordon Jenkinson, the public defender, originally represented Glover. Jenkinson met briefly with Glover at the March 1, 1991 pre-liminary hearing. Glover proclaimed his innocence, and later wrote

Jenkinson a letter with a list of potential alibi witnesses who would testify that Glover was in Florida on the date of the crime. Following this meeting, however, Jenkinson resigned as public defender and his cases were reassigned.

The court ultimately assigned Glover's case to Jerome Askins. Askins received Glover's file on June 17, 1991. Glover's trial was scheduled for the two week term of court beginning June 17. In addition to Glover's case, Askins was also responsible for "fifty or sixty" other assigned criminal cases during the term.

Askins first met with Glover on June 17. During this first meeting, Glover denied having committed the crimes. He again claimed he was in Florida during the robbery. Glover provided Askins with the names of approximately ten individuals whom he claimed would establish his alibi. Askins contacted some of these people, but determined that they would not provide any useful testimony. Askins said that he did not contact the other witnesses identified by Glover. Askins also reviewed Jenkinson's notes and talked to the investigating officer.

Glover's trial was held on June 19, 1991. After the jury was selected, but before it was sworn and outside its presence, Askins moved for a continuance. He advised the court that he had been unable to identify any witness who could establish an alibi defense on behalf of Glover. The trial court denied the motion, stating that it could not subpoena witnesses from Florida and that it had no assurance that any witnesses would attend the trial if it were rescheduled. In reality, South Carolina law does allow criminal defendants to subpoena out-of-state witnesses.

During the trial, the State presented five witnesses. The first witness, Preston Wilson, testified that he owned a trailer which he rented to a tenant. On January 20, 1991, he went to the trailer where he conversed with an acquaintance of the tenant, Eric Glover. On cross-examination by Askins, Wilson admitted he had no personal knowledge about whether Glover committed any crime.

The next, most important, witness was the victim, Wayne Cooper. Cooper identified Glover as the ringleader in his kidnapping and robbery. According to Cooper, around 7:00 P.M. on January 22, he was

driving his mother's 1980 white Thunderbird. Cooper stopped in a grocery store where he struck up a conversation with a stranger. While on the stand, Cooper identified Glover as the person with whom he engaged in conversation.

According to Cooper's testimony, Glover and Cooper then chatted about a variety of other matters, like the Super Bowl. Glover told Cooper that he was from Florida, and that he had just arrived in South Carolina. Glover and Cooper continued their conversation over drinks. While paying for the alcohol, Cooper opened his wallet. Cooper was carrying a little over $500. Cooper testified that Glover had an opportunity to observe the cash in Cooper's wallet because Glover was standing beside Cooper during the purchase. Cooper and Glover then decided to visit some female friends of Glover's. They drove to the women's house in Cooper's Thunderbird. Glover introduced Cooper to the women as his friend. After about twenty minutes at the house, Cooper wanted to leave. Cooper agreed to drop Glover off at the grocery store where they met.

Upon arriving, Cooper testified that Glover pulled a gun and told Cooper that this was a "stickup." Glover forced Cooper into the backseat and repeatedly struck him in the face with the gun. At that point, two other people joined Glover. They drove off with Cooper and Glover still in the backseat. During the drive, Glover grabbed Cooper's wallet. Glover continued to beat Cooper, thus preventing Cooper from seeing where he was being taken. Glover and his accomplices finally arrived at a dirt road. They pulled the car to the side of the road and checked to see if Cooper was still alive. After assuring themselves that he was indeed alive, they stuffed Cooper in the trunk and continued to drive.

About five minutes later, the car stopped outside of a trailer. Glover and the two others moved Cooper from the trunk to the trailer. As Glover and his accomplices searched the Thunderbird, Cooper escaped through the back door. Cooper ran to a nearby trailer home, and was eventually taken to a hospital.

Askins vigorously cross-examined Cooper, questioning him on the time of the crime, the light outside when he observed Glover, the ease with which Glover could have killed Cooper, what Cooper was doing

in the area, why Cooper could not identify the other two offenders even though he saw them, and other inconsistencies in his testimony.

The State then called Betty Lou Coker, the woman who lived in the other trailer home to which Cooper fled after he escaped. Coker testified that Cooper arrived at her mobile home around 8:30 P.M. According to Coker, Cooper said that he had just been beaten up, that his assailants had tried to kill him, and that they had taken his money. During cross-examination by Askins, Coker admitted that she had never seen Glover. Cooper's father also testified for the State. He confirmed that Cooper was driving the 1980 white Thunderbird on January 22. Askins cross-examined Cooper's father on a variety of matters, including why Cooper was in town that night and whether the father had any personal knowledge about the crime itself.

The State finally called Officer Debra Collins. Collins testified that she first saw Cooper in the hospital the night he was assaulted. According to Collins, Cooper told her that "this guy pulled a gun on him and made him get in the car against his will." Cooper could not give the name of his assailant, but did provide a description of him. He said that his attacker was between 5'5" and 5'6", weighed between 140 and 150 pounds, had a light complexion, and walked slightly bowlegged. Cooper did not know the location of the trailer, except that it was down a dirt road.

Collins then told the jury that soon after conversing with Cooper, she received a call from another officer who had found a white Thunderbird at a trailer off a dirt road. Officer Collins went to the location and determined that the car was registered to Cooper's mother. Collins also determined that Preston Wilson owned the trailer. Wilson told Collins that nobody was supposed to be in the trailer because the man renting it from him had already left town. Collins then entered the trailer, where she found a note written to "Dear Grandmother" and signed "Eric Glover." Askins cross-examined Collins on a variety of issues.

After the State rested, Askins asked the judge for a directed verdict. Although the court denied the motion, it granted Askins' motion to reduce the charge of grand larceny to use of a vehicle without the owner's consent. Askins also consulted with his client and deter-

mined, after a lengthy discussion, that Glover did not want to testify. The defense did not call any witnesses. During his closing argument, Askins pointed out the inconsistencies in Cooper's testimony. He also noted that Cooper might be out to frame Glover. Askins argued that the only person who could say that Glover actually did anything illegal was Cooper himself. Askins maintained that Cooper might have been intoxicated or otherwise impaired that night. He also asked why Cooper could not remember Glover's name the night of the crime. According to Askins, little things did not add up, and if the little things were wrong, the "big things" could be wrong as well. Twice before the verdict, the State offered Glover a plea. After consulting with Askins, Glover decided to reject the plea offer.

The jury found Glover guilty on all charges, although it found that Glover committed the lesser included offense of assault and battery of a high and aggravated nature as opposed to the more serious charge of assault and battery with intent to kill. After the verdict, Askins renewed his motion for a directed verdict and appealed to the judge for leniency. Askins noted that Glover was only 18 at the time of the crime, that he had no prior criminal history, that he maintained his innocence throughout the trial, and that he had even rejected a plea agreement because he was not going to plead guilty to anything he did not do. The judge sentenced Glover to life in prison on the kidnapping charge, ten years consecutive on the armed robbery charge, and lesser concurrent sentences on the other charges.

After the South Carolina Supreme Court affirmed his conviction, Glover with a new attorney filed a motion for post-conviction relief in state court. Glover contended that his trial counsel was ineffective for failing to contact his alibi witnesses. At the hearing, Glover stated that he was in Florida at the time of the crime. Glover told the court that he had consistently maintained that he had been in Florida on January 22, and that he asked his previous attorney, Jenkinson, to contact his alibi witnesses. Glover stated that Willie Palmer could testify that he was in Florida on the night of January 22. Glover also identified at least eight other witnesses who could place him in Florida during the day of January 22. He testified that he gave all these names to his attorneys.

The only alibi witnesses who appeared in court, however, were Sandra Jordan and Sylvester Jordan. Sandra Jordan, Glover's aunt,

testified that she saw Glover in Florida at approximately 8:00 A.M. on January 22. Ms. Jordan named three other people who allegedly saw Glover during the day of the 22nd, none of whom were present at the hearing. Glover also called Sylvester Jordan, Glover's grandfather. Mr. Jordan was asked on direct examination if Glover was in Florida when the crime took place. Mr. Jordan responded by stating, "He was in Florida when this took place as they say. I don't know. And I don't think he did what they say he did." When asked by Glover's lawyer for more information, Mr. Jordan repeatedly replied, "I don't know nothing."

The state court granted Glover's motion for a new trial on ineffective assistance grounds. A divided South Carolina Supreme Court reversed, holding that Glover failed to establish a valid alibi defense at his post-conviction hearing and thus failed to show prejudice under *Strickland v. Washington. See Glover v. South Carolina*, 458 S.E.2d 538 (S.C. 1995).

Glover then filed a petition for a writ of habeas corpus in federal court. The magistrate judge granted summary judgment for the State on three of Glover's habeas claims, but permitted Glover to amend his Petition to add a fourth ground for relief regarding sentencing. State law at the time of sentencing set the maximum penalty for kidnapping at thirty years, not life. The state conceded error, and agreed with the limited grant of relief. On October 19, 2000, the district court granted the writ on Glover's second claim — ineffective assistance of counsel. The district court noted but did not address the petition's other three grounds for relief. South Carolina appeals.

II.

In *Strickland v. Washington*, 466 U.S. at 668, the Supreme Court set forth a two-part test for deciding ineffective assistance of counsel claims. First, the defendant "must show that counsel's performance was deficient." *Strickland*, 466 U.S. at 687. To prove deficiency, a defendant "must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. Second, the defendant must show that the deficient performance resulted in actual prejudice to the defendant. A showing of prejudice requires the defendant

to prove that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

*Strickland* and its companion case *United States v. Cronic*, 466 U.S. at 648, gave more specific instructions on finding prejudice. The Court stated that in certain limited contexts, "prejudice is presumed." *Strickland*, 466 U.S. at 692. In *Cronic*, the Court identified three distinct situations in which a presumption of prejudice is appropriate. First, prejudice is presumed when the defendant is completely denied counsel "at a critical stage of his trial." *Cronic*, 466 U.S. at 659. Second, per-se prejudice occurs if there has been a constructive denial of counsel. This happens when a lawyer "entirely fails to subject the prosecution's case to meaningful adversarial testing," thus making "the adversary process itself presumptively unreliable." *Id.*

Third, the Court identified certain instances "when although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." *Id.* (citing *Powell v. Alabama*, 287 U.S. 45 (1932)). A finding of per-se prejudice under any of these three prongs is "an extremely high showing for a criminal defendant to make." *Brown v. French*, 147 F.3d 307, 313 (4th Cir. 1998).

Absent these narrow circumstances of presumed prejudice under *Cronic*, defendants must show actual prejudice under *Strickland*. *See Strickland*, 466 U.S. at 692; *Cronic*, 466 U.S. at 666 and n.41. Actual prejudice requires the defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

Federal courts entertaining collateral attacks on state convictions have only limited powers of judicial review. *See Williams v. Taylor*, 529 U.S. 362 (2000); *Bell v. Jarvis*, 236 F.3d 149, 157 (4th Cir. 2000) (en banc). Under 28 U.S.C. § 2254(d)(1), this court may not grant a writ of habeas corpus when a State court resolved the merits of a claim unless the adjudication of the claim "resulted in a decision that

was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1) (Supp. IV 1998).

In this case, Glover argues that the South Carolina Supreme Court's decision was contrary to clearly established Federal law because it applied the actual prejudice standard of *Strickland* instead of the per-se prejudice analysis of *Cronic* and *Powell v. Alabama*, 287 U.S. at 45. In the alternative, Glover maintains that the South Carolina Supreme Court's decision was an unreasonable application of clearly established Federal law because absent counsel's errors, there is a reasonable probability that the jury would not have returned a verdict of guilty. We address each argument in turn.

### III.

### A.

Preliminarily, we may assume that Glover has satisfied the first prong of the *Strickland* analysis by showing "that counsel's performance was deficient." *Strickland*, 466 U.S. at 687. *Cf. Glover v. South Carolina*, 458 S.E.2d at 539-40 (assuming that counsel's representation fell below an objective standard of reasonableness). In this case, Askins' performance was not objectively reasonable. He failed to contact certain witnesses even though Glover provided him with names of potential alibi witnesses. He did not realize that a South Carolina statute allowed criminal defendants to compel the attendance of out-of-state witnesses necessary for the defense. Finally, Askins did not even realize that the sentence for kidnapping in South Carolina had been amended from a maximum sentence of life in prison to a maximum sentence of thirty years. Given these errors, combined with the fact that the State does not contest that Askins's performance was deficient, we may turn to the issue of prejudice.

### B.

Glover contends that the South Carolina Supreme Court misapplied clearly established Federal law by employing an actual prejudice test instead of a per-se prejudice one. We disagree.

1.

The facts do not come close to fitting within the first of *Cronic*'s three criteria for per-se prejudice. Glover was not completely denied counsel at a critical stage of the proceedings. At all relevant times, he was represented by counsel. Jenkinson represented Glover at the preliminary hearing. Askins represented Glover from two days before trial through at least the post-trial motions and sentencing. A finding of per-se prejudice for complete denial of counsel requires at a minimum that no lawyer be present at a critical stage of the proceedings. *See Roe v. Flores-Ortega*, 528 U.S. 470, 483 (2000) (citing *Cronic*, 466 U.S. at 659). Here, Askins' presence at counsel's table mandates a finding that Glover was not actually denied the assistance of counsel.

2.

Second, Glover was not constructively denied the right to counsel. Askins did not "entirely fail[ ] to subject the prosecution's case to meaningful adversarial testing" in such a way as to make "the adversary process itself unreliable." *Cronic*, 466 U.S. at 659. Askins acted as Glover's advocate at every step. He contacted some potential witnesses. He asked for a continuance. He vigorously cross-examined witnesses. He questioned motives. He highlighted testimonial inconsistencies. He advised his client on possible plea deals. He pointed out the flaws of the State's case to the jury. He made a vigorous closing statement. He asked the judge for a directed verdict both after the State's case and after the jury verdict.

Furthermore, Askins was able to convince the judge to reduce one charge against Glover from grand larceny to possession of a vehicle without the owner's consent. And he was able to convince the jury to find a verdict of assault and battery of a high and aggravated nature instead of assault and battery with intent to kill. Given these facts, we cannot say that Glover was constructively denied the right to counsel. This case is not one where the lawyer literally sleeps through the State's case or otherwise might as well be absent from the proceedings. Askins tested the State's case at every juncture. He was an active advocate for Glover. Askins fulfilled his role as defense attor-

ney by subjecting the State's case against Glover to "the crucible of meaningful adversarial testing." *Id.* at 656.

It is true, as we have noted and as the State has conceded, that Askins failed *Strickland*'s test of objectively reasonable performance. But not every case of deficient performance under *Strickland* represents a constructive denial of the right to counsel. In fact, it will be the rare claim of ineffective assistance that is tantamount to a constructive denial of counsel. *Strickland* remains the norm for ineffective assistance claims, and the Supreme Court has made clear that it will not countenance a per-se prejudice exception which will swallow the actual prejudice *Strickland* rule. *See, e.g., Roe*, 528 U.S. at 483; *Perry v. Leeke*, 832 F.2d 837, 842-43 (4th Cir. 1987) (en banc).

If we were to broaden the per-se prejudice exception to *Strickland*, we would only add an extra layer of litigiousness to ineffective assistance law. To designate certain categories of cases as *Cronic* "constructive denial" cases and others as *Strickland* "deficient performance" cases would promote a new threshold area of debate and complicate the handling of this most common area of contention on collateral review. For that reason perhaps, the Supreme Court refused to apply a rule of per-se prejudice in *Cronic* itself. Ineffective assistance is not the same thing as an absence of assistance. Because Askins served as an advocate for Glover and tested the State's case through the adversarial system, Glover cannot show that he was constructively denied his right to counsel.

### 3.

The third reason for finding per-se prejudice is if "the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." *Cronic*, 466 U.S. at 659-60. Since 1984, the time the Court articulated the tests for actual and per-se prejudice in *Strickland* and *Cronic*, it has never once found per-se prejudice under this third prong of *Cronic*.

In *Cronic*, the Supreme Court confronted the issue of a young real-estate lawyer who was allowed only 25 days of pretrial preparation in a complex mail fraud case. *See Cronic*, 466 U.S. at 649. The Court

held that despite a limited time to investigate and prepare the case, the limited experience of counsel, the gravity of the charge, the complexity of possible defenses, and the limited accessibility of witnesses to counsel, a per-se rule of prejudice was not appropriate. *See id.* at 652, 663.

Glover can point to only one case, *Powell v. Alabama*, in which the Court has found a presumption of ineffectiveness based on the circumstances surrounding the defendant's representation. *See Powell*, 287 U.S. at 45. *Powell*, decided in 1932, involved the infamous trial of several African-American men who faced the death penalty for raping a white woman on a train in Alabama. *See Powell*, 287 U.S. at 49-50. The defendants in *Powell* were not asked "whether they had, or were able to employ, counsel, or wished to have counsel appointed." *Id.* at 52. Instead, the court appointed "'all the members of the bar'" as counsel for purposes of arraignment. *Id.* at 56; *accord Cronic*, 466 U.S. at 660. On the day of the trial six days later, a lawyer from another state appeared, "but stated that he had not had an opportunity to prepare the case or to familiarize himself with local procedure." *Cronic*, 466 U.S. at 660. The court thus decided that the out-of-state lawyer would represent the defendants "with whatever help the local bar could provide." *Id.*

The *Powell* court recognized that the defendants in that case could not have received the assistance of counsel given the circumstances of the case. "The defendants, young, ignorant, illiterate, surrounded by hostile sentiment, haled back and forth under guard of soldiers, charged with an atrocious crime regarded with especial horror in the community where they were to be tried, were thus put in peril of their lives within a few moments after counsel for the first time charged with any degree of responsibility began to represent them." *Powell*, 287 U.S. at 57-58.

The circumstances of this case are nowhere close to *Powell*. Glover attempts to rely on the limited contact that he had with his first attorney, Jenkinson, the limited time that Askins had to prepare Glover's case and to investigate the potential alibi witnesses, the fifty or sixty other criminal cases for which Askins was responsible, and the severity of the crimes alleged in Glover's indictment. These facts simply do not strip the trial of all its integrity so that a per-se rule of preju-

dice is justified without resort to an examination of the actual circumstances of the case.

Indeed, this court has already held that in a case involving similar facts, a finding of per-se prejudice was not appropriate. *See Griffin v. Aiken*, 775 F.2d 1226, 1229-30 (4th Cir. 1985). In *Griffin*, the defendant argued that several factors justified a presumption of ineffectiveness. These included "minimal pre-indictment investigation by counsel," "continuous presence of counsel in court on other matters in the three-day period between indictment and trial," "limited time to talk with [the defendant] in the time period between the preliminary hearing and the morning of trial," and "the inability of counsel appointed on the day before trial to present constitutional grounds for the suppression of evidence since counsel had no knowledge of the facts of" the defendant's case. *Griffin*, 775 F.2d at 1229. Furthermore, the defendant's public defender had "between 100 and 140" other cases pending at the same time. *Id.* at 1230. Nevertheless, this court rejected the claim of per-se prejudice because "a review of the circumstances surrounding [the defendant's] representation reveals to us that in the same circumstances it was not unreasonable to expect that a competent lawyer could render effective assistance of counsel." *Id.* at 1230 (citing *Cronic*, 466 U.S. at 659-60).

And this court has also held that counsel appointed the day after indictment and the day of trial does not justify a finding of per-se prejudice under *Cronic*. *See Praylow v. Martin*, 761 F.2d 179, 181-83 (4th Cir. 1985). In *Praylow*, we stated that "late appointment of counsel" fails to justify "a presumption of ineffective assistance of counsel." *Id.* at 183.

We fail to see any materially distinguishable facts between this case and *Praylow* and *Griffin*. Here, Askins was not appointed until two days before trial, but he was able to spend some time on the case. In *Praylow*, counsel was appointed on the same day as the trial. Here, Askins had between fifty and sixty other cases, but counsel in *Griffin* had between 100 and 140 other cases. In *Griffin*, counsel spent hardly any time on the case and was in court on other matters continuously in the three-day period between indictment and trial. This case, like *Praylow* and *Griffin*, more closely resembles the facts of *Cronic* than it does the facts in *Powell v. Alabama*.

Indeed, the Supreme Court has long emphasized that late appointment of counsel does not *ipso facto* trigger a rule of per-se prejudice. *See Cronic*, 466 U.S. at 661-62. In *Chambers v. Maroney*, 399 U.S. 42, 53 (1970), the Supreme Court held that it would not presume prejudice where counsel appeared in the case only a few minutes before trial. The Court stated that it was "not disposed to fashion a *per se* rule requiring reversal of every conviction following tardy appointment of counsel." *Id.* at 54. Thus reviewing courts must generally regard trials, especially state trials on federal collateral review, through a particularized and individualized lens rather than through some broad-brush presumption of prejudice. Courts should not presume prejudice where the facts show otherwise, and *Strickland* has the bedrock virtue of looking at prejudice to the defendant in *each* case. We do not think the South Carolina Supreme Court violated any clearly established law by applying the *Strickland* rule and thereby serving the goal of individualized adjudication. Having found that application of a per-se prejudice standard would be improper, we turn to the question of whether Glover was actually prejudiced by Askins' defense.

## C.

Glover must show that Askins' errors sufficiently undermined confidence in the jury's verdict. *See Strickland*, 466 U.S. at 694 (There must be "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."). Glover maintains that the testimony of Sandra Jordan and Sylvester Jordan at the state post-conviction hearing creates a "reasonable probability that the result of the proceeding would have been different." *Id.* Like the district court, we disagree.

To begin with, the State presented strong evidence as to Glover's guilt. Wayne Cooper, the victim, testified how he spent over an hour with Glover, how they talked about a variety of things, how they went to meet friends of Glover's, and how Glover robbed, beat, and kidnapped him. The State was not presenting a victim who had a fleeting and transient exposure to the defendant. Cooper had more than ample opportunity to determine precisely how the defendant looked, and he recounted Glover's appearance to the police at the first opportunity.

Furthermore, the State established that Cooper's car was found in front of the Wilson trailer, where Glover had recently been seen. The State also presented the testimony of Betty Lou Coker, who stated that a badly beaten Cooper did indeed arrive at her trailer, which was located near the Wilson trailer, on the night of January 22.

After the jury verdict against Glover and the South Carolina Supreme Court's affirmance of it, the State gave Glover another opportunity to present evidence of his innocence at the post-conviction proceeding. At that hearing, Glover was ably represented by counsel. Without any time constraints to produce witnesses, Glover could present only his aunt, Sandra Jordan, and his grandfather, Sylvester Jordan. Neither could testify that Glover was in Florida at the time of the crime. Sylvester Jordan could state only that "He was in Florida when this took place as they say. I don't know. And I don't think he did what they say he did." When pressed for more information about Glover's whereabouts on the night of January 22, Mr. Jordan could state only, "I don't know nothing."

Sandra Jordan could testify only that Glover was in Florida around 8:00 A.M. on the morning of January 22, leaving ample time for Glover to arrive in South Carolina by that evening. As the South Carolina Supreme Court stated, "Ms. Jordan's testimony merely placed [Glover] in Florida between 8:00 and 8:30 a.m. on the date the crimes occurred. However, the crimes occurred in Williamsburg County over eleven hours later at approximately 8:30 p.m." *Glover*, 458 S.E.2d at 540. Indeed, Ms. Jordan estimated that it took her about 6 hours to drive from Florida to South Carolina. And while both Sandra Jordan and Glover purported to identify other people who could support the claim that Glover was in Florida on January 22, none appeared at the hearing. The testimony of Glover (who chose not to testify at trial), and of Mr. and Ms. Jordan standing alone, does not create a reasonable probability of a different outcome. As the South Carolina Supreme Court noted, "[t]he failure to contact Sylvester or Sandra Jordan did not result in prejudice to [Glover] as neither witness's [post-conviction hearing] testimony established an alibi defense." *Glover*, 458 S.E.2d at 540.

Moreover, nothing has cast doubt on Cooper's testimony. None of Glover's witnesses could testify, for instance, that they saw Cooper

with a different person on the 22nd. And they could not establish any reason why Cooper would be fabricating any part of his unfortunate experience that night. In short, the evidence at the post-conviction hearing failed to undermine confidence in the outcome of the trial. Indeed, although the district court granted the writ on the per-se prejudice rule of *Cronic*, it found that Glover could not show actual prejudice under *Strickland*. We agree with the district court on this point. Indeed, our fine dissenting brother makes no contention that this defendant is innocent of any of the crimes with which he was charged. The South Carolina Supreme Court's finding of no actual prejudice was not an unreasonable application of clearly established Federal law.

IV.

It is a cardinal principle of criminal justice that federal courts must give state court convictions a significant measure of respect. In federal habeas cases, "deference to state-court findings is mandated by 28 U.S.C. § 2254(d)." *Greene v. Georgia*, 519 U.S. 145, 146 (1996) (per curiam); *see also Williams*, 529 U.S. at 410. The South Carolina Supreme Court applied the landmark *Strickland* decision to Glover's ineffective assistance of counsel claim and reasonably found an absence of actual prejudice to the defendant. The state court ruling on this point was a sound one, and a federal court has no basis for upsetting it. For the foregoing reasons, the judgment of the district court is reversed and remanded for further proceedings consistent with this opinion.

*REVERSED AND REMANDED*

MICHAEL, Circuit Judge, dissenting:

Eric Glover, who was charged with kidnaping and other serious crimes, was denied effective assistance of counsel in the summer of 1991, when the public defender system in Williamsburg County, South Carolina, broke down completely. Nothing was done on Glover's case until the third in a succession of lawyers was appointed to represent him on June 17, 1991, two days before trial. Glover was tried and sentenced to life in prison on June 19, 1991, before his new lawyer had an opportunity to contact several potential alibi witnesses

who lived out of state. Because no lawyer could have effectively represented Glover in the circumstances, I would affirm the district court's award of the writ of habeas corpus. I therefore dissent, respectfully.

I.

Glover, who could not afford a lawyer, got trapped in the fallout after the public defender in Williamsburg County, South Carolina, resigned in 1991. Glover was arrested in Florida on January 24, 1991, pursuant to a South Carolina warrant for his arrest on kidnaping and armed robbery charges. He immediately waived extradition, and on February 3, 1991, he was transferred to the jail in Williamsburg County, South Carolina, to await further proceedings. It was not until three and one-half weeks later, at his preliminary hearing on March 1, 1991, that Glover met with the public defender, Gordon Jenkinson, for the first and only time. Jenkinson spent a very short time talking to Glover about his case. Glover was able to convey to Jenkinson his claim of innocence that was based on an alibi defense: Glover said that he was in Florida on January 22, 1991, when the crimes for which he was charged in South Carolina were committed. Glover told Jenkinson about one alibi witness in particular, Willie Palmer, his brother-in-law, who Glover says was with him in Florida during the hours of the South Carolina crimes. Glover, who remained in jail, wrote Jenkinson several letters listing other potential alibi witnesses for Jenkinson to interview. Jenkinson never responded to any of Glover's letters, and he never contacted Glover after the preliminary hearing on March 1, 1991. Apart from showing up at Glover's preliminary hearing, it appears that Jenkinson did not do any work on his case. In particular, Jenkinson did nothing to investigate Glover's alibi defense.

Although Glover was never given any notice of the event, Jenkinson resigned as public defender sometime between Glover's hearing on March 1 and late May of 1991. Around the first of June all of the public defender's cases, numbering about 120, were assigned to two Williamsburg County lawyers, Jerome Askins and William Pridgen. The case load was to be divided, with each lawyer taking fifty or sixty cases. Many of the cases would be called for trial during a two-week term of court set to begin on June 17, 1991. In the meantime, the pub-

lic defender's resignation had led to a huge backlog of preliminary hearings. As a result, Askins and Pridgen spent the first two weeks of June, from morning until evening each day, representing indigent defendants in preliminary hearings. Because the term of court began as soon as the preliminary hearings concluded, Askins and Pridgen had no time to investigate the cases of other defendants, such as Glover, who had their preliminary hearings earlier.

As the defender's cases were being divided, Glover's case was first assigned to Pridgen. Pridgen, however, discovered that he was already representing one of Glover's co-defendants, so he had to decline the representation of Glover. It was not until Monday, June 17, 1991, the first day of the term, that Glover's case was finally assigned to Askins. On that day Glover was brought to the Williamsburg County Courthouse, presumably to answer his indictment for kidnaping, armed robbery, and related charges. At that time Glover believed that Jenkinson, the public defender, was still his lawyer and that Jenkinson had subpoenaed the necessary witnesses. Glover was therefore puzzled when a man he had never seen before (Askins) came into the holding room for prisoners, called his name, and told him that he would be representing him. Glover quickly realized that Askins, who had just received his file that day, knew nothing about his case. Yet Glover's trial was to start in two days, on June 19, 1991.

At their meeting on June 17 Glover said to Askins, "I got witnesses that can prove I didn't do this." Glover identified ten persons in Florida who were potential witnesses, several of whom Glover said could provide an alibi. The first witness Glover identified was Willie Palmer, who Glover said was with him in Florida when the kidnaping and other crimes occurred in South Carolina.

Sometime on Monday, June 17, Askins began trying to contact the potential witnesses in Florida, but he was not able to reach anyone that day. Askins's lack of success is understandable because he was operating under several impediments. First, because the term of court was under way and Askins was responsible for about sixty cases, he could not leave the courthouse. Askins had to remain at the courthouse because, for the most part, he did not "know from day to day or from hour to hour which case [would] be called or in what order." Second, Askins did not have telephone numbers for most of the wit-

nesses, which, as he acknowledged, impeded his efforts "to try to locate some of these people." Third, there were no pay telephones or other convenient telephone facilities for lawyers in the Williamsburg County Courthouse. As a result, Askins had to borrow a telephone wherever he could find one, sometimes in the clerk's office and sometimes in other offices. When a potential witness was not available to take his call, Askins was not able to provide a handy number where he could be reached for a callback. Fourth, Askins had no assistance in his efforts to contact witnesses or otherwise to investigate Glover's case. In particular, Askins did not have access to an investigator or the funds to hire one.

On June 18, the day before trial, Askins was only able to contact two of the ten persons on the Florida list, Glover's father and stepmother. They, however, were never identified as alibi witnesses. Finally, on the morning of trial Askins was able to talk to one of the potential alibi witnesses from Florida, Roy Brown, who could not provide any assistance. Thus, as trial began Askins had not contacted (indeed, he was never able to contact) seven of the Florida alibi witnesses. Most notably, he did not contact Willie Palmer, the main alibi witness identified by Glover.

Because of his inability in the time available to get in touch with potential alibi witnesses in Florida, Askins realized that Glover "would be at a terrible disadvantage" if the trial went forward as scheduled. Accordingly, Askins moved for a continuance. He advised the court that he had not had the opportunity to talk with several Florida residents who, according to his client (Glover), could testify that Glover was in Florida and was "not in South Carolina during the times of these alleged offenses." The court denied the motion, noting that it was "not going to continue the case based on Florida witnesses the court has no jurisdiction over." Apparently, neither the court nor Askins was aware that a defendant in a criminal case in South Carolina could subpoena out-of-state witnesses under the Uniform Act to Secure the Attendance of Witnesses from Without a State in Criminal Proceedings. *See* S.C. Code Ann. § 19-9-70; Fla. Stat. Ann. § 942.02.

Glover was forced to trial on June 19. The trial ended that same day, and Glover presented no defense. After the jury returned a guilty verdict at 6:36 p.m., the judge proceeded directly to post-trial motions

and sentencing. (All of these proceedings are reported in less than three pages of transcript.) Askins moved for a new trial on the ground that there had been insufficient time to contact witnesses in Florida. The motion was denied. The judge then announced that the matter was "ready for sentencing." The judge asked Glover four or five perfunctory questions, heard very briefly from Askins, and then sentenced Glover to life in prison plus ten years. Glover was nineteen years old when he was sentenced. At that time neither the trial judge nor Askins knew that shortly before Glover's trial the South Carolina kidnaping statute had been amended to change the penalty from a mandatory life sentence to a term not to exceed thirty years. *Compare* S.C. Code Ann. § 16-3-910 (Law. Co-op. 1985) *with* § 16-3-910 (Law. Co-op. Supp. 2000).

The South Carolina Supreme Court affirmed Glover's conviction and sentence. Thereafter, Glover filed an application for post-conviction relief in state court. After an evidentiary hearing the state habeas court granted Glover a new trial, finding that he had "received ineffective assistance of counsel due to the shortness of time between counsel's initial meeting with [Glover] and his trial only two (2) days later." The court also found that Glover "was not afforded sufficient time within which to contact potential witnesses." A divided (3-2) South Carolina Supreme Court reversed on the ground that Glover "failed to show [that] counsel's action or inaction resulted in [actual] prejudice." *Glover v. South Carolina*, 458 S.E.2d 538, 540 (S.C. 1995). Glover then filed a petition for a writ of habeas corpus in federal court in South Carolina. The district judge granted the writ after concluding that Glover "was both actually and constructively denied the assistance of counsel." I would affirm the order granting the writ for the following reasons.

## II.

The Sixth Amendment right to counsel "guarantees an accused 'adequate legal assistance.'" *United States v. Cronic*, 466 U.S. 648, 655 (1984) (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 344 (1980)). "Unless the accused receives the effective assistance of counsel, 'a serious risk of injustice infects the trial itself.'" *Id.* at 656 (quoting *Sullivan*, 446 U.S. at 343). To establish ineffective assistance of counsel, a defendant must show (1) objectively deficient performance and

(2) prejudice. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). The majority readily concludes, and the state concedes, that Glover meets the first element of the *Strickland* test because his lawyer's "performance was not objectively reasonable." *Ante* at 9. The question is whether Glover has established prejudice, and I am convinced that he has. Prejudice occurs when the lawyer's substandard performance "deprive[s] the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. As a general rule, a defendant must show actual prejudice, but there are at least three situations when prejudice is presumed. *See Cronic*, 466 U.S. at 658-660. One situation is when "the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiring into the actual conduct of the trial." *Id.* at 659-60. A presumption of prejudice does not follow automatically from the "'tardy appointment of counsel.'" *Id.* at 661 (quoting *Chambers v. Maroney*, 399 U.S. 42, 54 (1970)). However, when circumstances "make it unreasonable to expect that counsel could adequately prepare for trial," a presumption of prejudice is justified. *Id.* at 661-62. Specifically, prejudice may be presumed when circumstances surrounding the short time available for investigation and preparation make witnesses inaccessible to the defense. *See id.* That is this case.

The majority rejects Glover's claim by saying that he seeks "some broad-brush presumption of prejudice." *Ante* at 14. The picture that Glover paints is not done with a broad brush. It portrays a set of circumstances that would render any lawyer — no matter how skilled — incapable of providing effective assistance. The right to the effective assistance of counsel includes the right to have one's lawyer adequately investigate and prepare the case. *See Powell v. Alabama*, 287 U.S. 45, 57-58 (1932) (noting that "consultation, thoroughgoing investigation and preparation [are] vitally important" in providing effective representation).

Due to a peculiar set of circumstances, Glover's lawyer (Askins) was assigned a backbreaking load of work that had to be done under intolerable conditions in too little time. Sometime in the second quarter of 1991 the Williamsburg County, South Carolina, public defender resigned, leaving about 120 indigent defendants without counsel. As a two-week term of court was about to begin, during which many of

these cases would be called, Askins learned that he would be assigned one-half (50 to 60) of the public defender's cases. Askins was not assigned Glover's case until the first day of the term, Monday, June 17, which was just two days before trial. When Askins met with Glover that Monday, he learned that Glover wished to assert an alibi defense to the several charges, which included kidnaping. Glover gave Askins a list of ten witnesses (most of them in the alibi category) located in Florida. Glover was not able to provide telephone numbers.

To begin with, two days is not enough time to investigate and prepare an alibi defense based on witnesses who have never before been contacted and who are out of state, several hundred miles away. Askins's problems of lack of time and distant witnesses were aggravated by other conditions. The term of court was under way, and Askins could not leave the courthouse because he was responsible for many cases in addition to Glover's. As Askins acknowledged, he did not know from hour to hour when some of his other cases might be called. Askins did not have the assistance of an investigator, so he had to try to contact the Florida witnesses by telephone from the courthouse. Because there were no telephone facilities available for lawyers, Askins had to borrow a telephone in the clerk's office or in other public offices as he attempted to locate the Florida witnesses. When witnesses were not available at the time Askins called, it was difficult for him to leave messages and request callbacks. It is little wonder that Askins was not able to contact any witnesses on Monday and only two on Tuesday (Glover's parents, who were *not* alibi witnesses). It was not until Wednesday, the day of trial, that Askins finally got in touch with one of the potential alibi witnesses, Roy Brown, who could not help. The trial took place without Askins contacting the other alibi witnesses, including the main one, Willie Palmer, who Glover says was with him in Florida when the crimes in South Carolina occurred.

With respect to the issue of witness availability, the state habeas court determined that even if Askins had located the witnesses in Florida, they would not have been available for trial. In the course of two short days Askins would have had to contact the witnesses in Florida, have subpoenas issued and served in Florida, arrange for the witnesses to travel to South Carolina, and ultimately prepare them to testify. The state habeas court therefore found — in a finding that was

not disturbed by the South Carolina Supreme Court — that "even if [Askins] had contacted the witnesses who could have helped, they could not get here in time from Florida as the case was due to commence" immediately. Glover, therefore, was denied access to his witnesses.

Askins was not able to spend all of the two days between his appointment and trial on Glover's case. Certain of his other fifty or sixty indigent cases demanded some of his time. As the district court observed, "[c]ommon sense dictates . . . that substantial portions of the brief time available to [Askins] during the two days . . . was dedicated to the other cases which were assigned to him." The workload and time pressures not only prevented Askins from conducting a thorough factual investigation, they also kept him from doing the most basic legal research. First, when Askins moved for a continuance, he was unable to respond when the judge denied the motion on the ground that the Florida witnesses were beyond the court's subpoena power. If time and circumstances had allowed for thorough research, Askins would have known that the out-of-state witnesses were subject to subpoena under the uniform act adopted by South Carolina and Florida. Second, when the trial judge, within minutes of the guilty verdict, sentenced Glover to life in prison on the kidnaping count, Askins was unable to advise the judge that kidnaping no longer carried a mandatory life sentence. A review of the recent amendment to the kidnaping statute would have revealed that kidnaping carried a maximum term of thirty years. The sentencing error will be corrected, but Askins's inability to research the penalty for kidnaping confirms that circumstances rendered him inherently incapable of providing effective assistance.

I respectfully disagree with the majority's argument that the existing cases do not suggest that Glover is entitled to relief. Specifically, the majority contends (1) that Glover's case is "nowhere close" to *Powell v. Alabama*, 287 U.S. 45 (1932), where the Supreme Court presumed ineffective assistance based on the circumstances and (2) that there are no "materially distinguishable factors" between Glover's case and *Griffin v. Aiken*, 775 F.2d 1226 (4th Cir. 1985), and *Praylow v. Martin*, 761 F.2d 179 (4th Cir. 1985), two cases where we declined to presume prejudice. Glover's case is not like *Powell v. Alabama* to the extent that he was not seized by a sheriff's posse, placed

under guard of the militia, or arraigned and tried "in an atmosphere of tense, hostile and excited public sentiment." *Powell*, 287 U.S. at 51. Glover's case is like *Powell v. Alabama*, however, on the fundamental point that he was "not accorded the right to counsel in any substantial sense" because his lawyer was unable to engage in "thoroughgoing investigation and preparation." *Id.* at 57, 58.

Glover's case is materially different from *Griffin* and *Praylow*. Neither case involved a situation where defense counsel was unable to contact potential witnesses or conduct a thorough investigation. In *Griffin* the defendant's lawyer was carrying between 100 to 140 cases, but he had nearly two months, not two days, to prepare the case. During that time the lawyer was able to meet with the defendant several times, employ an investigator, review the prosecutor's files, and interview several witnesses. This level of pretrial preparation, we held, did not "justify a presumption of ineffective counsel." *Griffin*, 775 F.2d at 1230-31. In *Praylow* the defendant had two lawyers representing him, and he entered a guilty plea after talking with them several times. Although one of the lawyers was not appointed to represent the defendant until the day of his guilty plea, the other lawyer had been representing him on a related case for over seven months. The two lawyers worked together on the case and conducted an adequate investigation. In these circumstances, we declined to presume ineffectiveness. *See Praylow*, 761 F.2d at 183. In short, neither *Griffin* nor *Praylow* stands in the way of a writ in this case.

I am convinced that the South Carolina Supreme Court, in reversing the grant of the writ by the state habeas court, made "a decision that was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The rule in *Cronic* is straightforward: circumstances giving rise to a Sixth Amendment violation are present "when although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." *Cronic*, 466 U.S. at 659-60. The circumstances here prevented Askins from conducting a thorough investigation of Glover's case, especially his alibi defense. The situation was so intolerable that no lawyer could have done the job. Askins's performance was deficient through no fault of his own, and

the circumstances impeding his ability to provide Glover effective representation trigger a presumption of prejudice. The state habeas court and the district court were therefore correct: the writ should be granted.