# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**Richard Scott Bennett,**
**Petitioner Below, Petitioner**

**vs) No. 16-0535** (Monroe County 11-C-26)

**David Ballard, Warden,**
**Mount Olive Correctional Complex,**
**Respondent Below, Respondent**

**FILED**

**September 1, 2017**

RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

Petitioner Richard Scott Bennett, by counsel Scott E. Johnson, appeals the May 5, 2016, order of the Circuit Court of Monroe County that denied his petition for post-conviction habeas corpus relief. Respondent David Ballard, Warden, Mount Olive Correctional Complex, by counsel Gordon E. Mowen, II, filed a response in support of the habeas court's order. Petitioner filed a reply.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

In October of 2007, Edwina I.[1] (the "victim") died on the floor of her trailer in Monroe County. The cause of death was blunt and sharp force trauma to the victim's head caused when the victim landed face first onto the edge of a metal bedframe. The trauma caused the victim's brain to bleed and swell over a period of about two days until her death. Present at the scene were petitioner, who lived with the victim, and the victim's three children: an eleven-year-old daughter (the "older daughter"), a nine-year-old daughter (the "younger daughter"), and a four-year-old son.

In 2008, a grand jury indicted petitioner for the murder of the victim. Thereafter, the trial court appointed Richard Gunnoe as petitioner's first trial counsel. A trial date was set for August of 2008. However, in July of 2008, Mr. Gunnoe filed a motion to withdraw based on a conflict of interest in that he had previously represented Elisha F. who was slated to testify for the State at

---

[1]Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W.Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W.Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W.Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W.Va. 641, 398 S.E.2d 123 (1990).

1

petitioner's trial. Thereafter, the circuit appointed Geoffrey Wilcher and Jeffrey Rodgers to represent petitioner. Petitioner's four-day trial commenced on July 14, 2009. The State called more than twenty witnesses during its case-in-chief; petitioner's counsel cross-examined all but three of these witnesses. The State's witnesses included the following:

Cassandra Owens, a contract social worker for the Bureau of Child Protective Services ("CPS"), testified that she knew the victim because she had worked with her on parenting skills. Ms. Owens testified that, four months prior to the victim's death, the victim had called her from a neighbor's house. During the call, the victim claimed that she was afraid of petitioner because he had a plan to kill her. However, when Ms. Owens called the victim the next day, the victim claimed she had been hallucinating on diet pills when she said petitioner had a plan to kill her. Ms. Owens testified that, during this call, she heard petitioner in the background coaching the victim on what to say.

Onita Meadows testified that she had known petitioner for twelve years and had worked with him. Ms. Meadows testified that she stopped by petitioner's trailer one day where she met the victim who had a black eye. Ms. Meadows testified that the victim said the black eye occurred when she (the victim) bumped heads with petitioner, but Ms. Meadows believed the victim was lying to protect petitioner.

Elisha F. testified that she met the victim at the victim's trailer. The victim would not look her in the eye. The victim's throat was purple, the whites of her eyes were "nothing but blood," and she had bruises all over her face and body. On a second trip to the trailer, Elisha F. noticed that petitioner, his sister, the sister's boyfriend, and the victim's younger daughter were "being mean" to the victim. When Elisha F. asked petitioner why they were being mean to the victim, petitioner told her that the victim and the children's biological father had sexually abused the victim's children. Petitioner then had the victim's children explain in detail what the victim and their biological father had done to them. Elisha F. asked petitioner why the victim was still around the children if the victim had done such things. Petitioner replied that the victim, whom he described as a "fat ass" and a "whore," "ain't going to be here long"; that he was going to kill the victim for what she had done to her children; and that he intended to take the victim's body and "throw her in one of them caves." Elisha F. testified that petitioner threatened to kill the victim at least ten times during this conversation and appeared very serious when he spoke. Elisha F. was so upset by what she heard, she called her own CPS caseworker, Jennifer Ratliff, to report petitioner's threats.

CPS caseworker Jennifer Ratliff testified that she received a call from Elisha F. regarding petitioner's threats and the children's claims of abuse. Ms. Ratliff testified that Elisha F.'s claims were very vague and that Elisha F. had lied to CPS in the past; therefore, no investigation ensured.

The victim's younger daughter, who was then eleven years old, testified as follows: At petitioner's trailer, she slept alone with petitioner in the largest bedroom. She witnessed petitioner hit and kick the victim all over her body many times; hit the victim with a metal pole; put a rope around the victim's neck and drag her around by the rope with his car; and push the victim into a fire. Petitioner hit her and her siblings. She tried to call the police, but petitioner

2

took the phone out of her hands. Petitioner made her hit the victim on several occasions. On the night the victim was mortally wounded, she saw petitioner push the victim down the trailer's steps. The victim landed on some bedsprings and cut her head. As a result, the victim was bleeding and crying. The victim crawled up the steps and into her bedroom. She went to the victim's room and observed a "big scar" down the victim's face. The victim said, "Help me." The victim could only crawl and mumble the next day. The victim bled a lot and blood was "everywhere." Petitioner burned everything with blood on it. The morning after the victim died, she and her siblings accompanied petitioner to petitioner's sister's house. Petitioner told his sister he had killed the victim and begged his sister not to call the police. Petitioner left his sister's home and went to buy lime. Petitioner told the sales person that the lime was for plants. Petitioner was going to chop up the victim's body and place it in the sewer, but decided to place lime on the victim's body instead. The day after the victim died, she (the younger daughter) talked to "Monica" (a forensic investigator). She told the forensic investigator that the victim was with the children's biological father on the night the victim was injured.

On cross-examination, Defense Counsel Wilcher, asked the younger daughter, "Do you remember telling [the forensic investigator] you missed [petitioner]?" The younger daughter replied, "Yes, 'cause we didn't know what to do 'cause we was brainwashed." The younger daughter further testified that "brainwashed" meant, "when someone else, like, confuses your mind and get into your mind and changes—twists up different things in your mind to believe them."

The victim's older daughter, who was then thirteen years old, testified as follows: When she was ten-years-old, she lived with the victim and her biological father. Her parents hired her out to men for money. The men would touch her and make her touch them. Her father sexually abused her and stuck a carrot "up her little brother's butt." When she, her siblings, and the victim moved into petitioner's trailer, her biological father put the victim's head through a glass window and went to jail as a result. In the trailer, petitioner slept in the largest bedroom with her younger sister. Petitioner frequently hit and kicked the victim, hit the victim with a hammer, dragged the victim around with a rope around her neck, and pushed her into a fire. Petitioner forced the victim to put their dog's "privates into her mouth." Petitioner hit her (the older daughter) because he did not want her to tell any of the things that happened at the trailer. Petitioner forced her to hit the victim and to stab the victim with a knife. Petitioner also made her younger sister and her little brother hit the victim.

The older daughter also testified that on the night the victim hit her head, petitioner kicked the victim down the trailer steps. The victim fell through the bannister and her head landed on a "pointy-edge hooked to the bed frame." The hook gauged into the victim's face, around her eye area. The victim crawled into the house dripping blood. She and her younger sister tried to bandage the wound that was "massively bleeding." Awhile later, petitioner carried the victim to a vacant trailer that was adjacent to his trailer. There, petitioner put his knee on the victim's head and "blood flew everywhere." Petitioner then painted the floor with red and silver spray paint. Petitioner left the victim in the vacant trailer until the next day, when he returned the victim to his trailer. At that time, the victim "wasn't acting right," "couldn't talk right," and "couldn't walk." The victim was still alive that night, but died in "a day or two." After the victim died, she, petitioner, and her sister cleaned up all the blood and burned everything they could not

clean. Petitioner told her he was going to put lime on the victim's body. Petitioner and the three children went to petitioner's sister's house where petitioner told his sister and her boyfriend what had happened, and asked them not to call the police. Thereafter, petitioner and the children purchased lime and returned to the trailer. The police came to the trailer soon thereafter.

On cross-examination, the older daughter admitted she told the forensic investigator that the victim had been with the children's biological father on the night the victim was injured. She also testified that petitioner "brainwashed" her to say that and that the story about her biological father was not true.

Medical examiner and forensic pathologist Nabila Haikal, M.D., testified as follows: The victim's head injury was likely fatal, but the open wounds on the victim's head could have contributed to her death. The victim had a black eye and other face and neck injuries. There were brown and yellowing bruises on the victim's face; injuries to her chest and abdomen; bruising and scrapes on her back; bruising on her buttock; seven fractured ribs; defensive wounds on the back of her forearms and the palms of her hands; and wounds consistent with stabbing.

Joanna Scott, petitioner's sister testified as follows: Petitioner and the victim's children came to her trailer while she and her then-boyfriend, Dale Bragg, were at home. Petitioner was shaking and crying and admitted he beat the victim to death. Petitioner asked both she and Mr. Bragg to help him move the victim's body. Petitioner said he intended to take the body behind the couple's trailer and cover it with lime. She made up various excuses as to why she could not help petitioner move the body. Petitioner called a hardware store from Ms. Scott's home to inquire about purchasing lime. As soon as petitioner left, she and Mr. Bragg went to a second location and called the police. She also testified that she had seen (1) petitioner hit the victim and the victim's daughters; (2) bruises and a black eye on the victim; and (3) petitioner be mean to the victim.

Dale Bragg, petitioner's sister's boyfriend, confirmed petitioner's sister's testimony.

Cpl. Scott Keaton testified that, in response to petitioner's sister's call to the police, he and other officers responded to petitioner's trailer. When petitioner saw the police cruisers, he jumped in his car and drove away. The officers pursued petitioner for about five miles. Thereafter, petitioner's car accelerated, left the road, and struck a tree. The police captured petitioner and searched his car where they found bags of lime.

Bridgett Magnetti, the victim's daughters' treating psychologist, testified at length about petitioner's sexual abuse of the younger daughter. Ms. Magnetti also testified that both daughters suffered from Post-Traumatic Stress Disorder and Child Sexual-Abuse Accommodation Syndrome ("CSAAS"). Ms. Magnetti opined that the CSAAS explained why the daughters initially blamed their biological father for the victim's death and then, later, blamed petitioner.

Leroy Fowler, who met petitioner in prison in 2008, testified to his conversations with petitioner in prison. Mr. Fowler testified that petitioner admitted (1) he did not like the victim because she had sexually abused her children; (2) he hit the victim who sustained a head injury

4

during the fight; (3) the victim stayed in her bedroom and died a day or two later; and (4) he wanted the victim to die.

During petitioner's case-in-chief, trial counsel called an expert, George R. Nichols, M.D., a forensic pathologist, who testified that the victim's injuries could have been caused by an accident or by a non-intentional homicide. Dr. Nichols also opined on the differences between the various types of homicide. Petitioner's counsel also called a second witness, Frankie Bolen, in an effort to impeach the testimony of State witness Leroy Fowler. Petitioner did not testify.

On July 17, 2009, the jury found petitioner guilty of murder in the first degree and did not recommend mercy. Thereafter, the circuit court sentenced petitioner to life in prison without the possibility of parole. The circuit court denied petitioner's motion for a new trial on November 10, 2009. This Court refused petitioner's direct appeal of his conviction on September 22, 2010.

Petitioner filed a pro se petition for post-conviction habeas relief on May 12, 2011. On October 15, 2014, petitioner's habeas counsel, Lori M. Waller, filed petitioner's amended petition and *Losh* list. In that list petitioner alleged (1) prejudicial pretrial publicity; (2) coerced confessions; (3) ineffective assistance of counsel; (4) improper venue; (5) the use of informers to convict; (6) constitutional errors in evidentiary rulings; (7) instructions to the jury; (8) claims of prejudicial statements by the prosecutor; (9) sufficiency of the evidence; and (10) petitioner's absence during part of the proceedings.

The habeas court held petitioner's omnibus evidentiary hearings on July 17, 2015, and December 7, 2015. Testifying at these hearings were petitioner's initial trial counsel Richard Gunnoe; one of petitioner's two trial counsel, Jeffrey Rodgers; petitioner; and petitioner's expert witness, Mary Lou Newberger, a former chief federal public defender. Petitioner's second trial counsel, Geoffrey Wilcher did not testify as he died prior to the omnibus hearings. By order dated May 5, 2016, the circuit court denied relief on the ground that petitioner had received a fair trial and competent representation. Petitioner now appeals that order.

This Court reviews appeals of circuit court orders denying habeas corpus relief under the following standard:

> "In reviewing challenges to the findings and conclusions of the circuit court in a habeas corpus action, we apply a three-prong standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard; the underlying factual findings under a clearly erroneous standard; and questions of law are subject to a *de novo* review." Syllabus point 1, *Mathena v. Haines*, 219 W.Va. 417, 633 S.E.2d 771 (2006).

Syl. Pt. 1, *State ex rel. Franklin v. McBride*, 226 W.Va. 375, 701 S.E.2d 97 (2009).

Petitioner raises four assignments of error on appeal. Petitioner first argues he was denied effective assistance of counsel when Mr. Wilcher, one of his two trial counsel, conceded petitioner's guilt in closing argument. Specifically, Mr. Wilcher, said, "[n]ow fell or pushed? I'm not going to suggest to you that . . . you should return a verdict of acquittal, that this was just an accident, just a big mistake. I'm not going to insult your intelligence in that fashion." Petitioner

5

maintains that his defense theory was that the victim fell accidentally, that his trial goal was acquittal, and that he told counsel not to admit guilt at trial. Petitioner argues that because Mr. Wilcher conceded guilt, Mr. Wilcher usurped his right to set the objective, purposes, and goals of the representation; and, therefore, that representation fell below a reasonable standard of professional competency. Finally, petitioner claims that because trial counsel's action in admitting guilt was essentially a functional denial of counsel at a critical stage of trial, petitioner need not show any prejudice pursuant to *United States v. Cronic*, 466 U.S. 648, 658-59 (1984).

We review claims of ineffective assistance of counsel, under the following standard:

> In the West Virginia courts, claims of ineffective assistance of counsel are to be governed by the two-pronged test established in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984): (1) Counsel's performance was deficient under an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different.

Syl. Pt. 5, *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995). We have also held that,

> [i]n reviewing counsel's performance, courts must apply an objective standard and determine whether, in light of all the circumstances, the identified acts or omissions were outside the broad range of professionally competent assistance while at the same time refraining from engaging in hindsight or second-guessing of trial counsel's strategic decisions. Thus, a reviewing court asks whether a reasonable lawyer would have acted, under the circumstances, as defense counsel acted in the case at issue.

Syl. Pt. 6, *id.* at 6-7, 459 S.E.2d at 117-18. Finally,

> the cases in which a defendant may prevail on the ground of ineffective assistance of counsel are few and far between one another. This result is no accident, but instead flows from deliberate policy decisions this Court and the United States Supreme Court have made mandating that "[j]udicial scrutiny of counsel's performance must be highly deferential" and prohibiting "[i]ntensive scrutiny of counsel and rigid requirements for acceptable assistance[.]" *Strickland*, 466 U.S. at 689–90. . . . In other words, we always should presume strongly that counsel's performance was reasonable and adequate. A defendant seeking to rebut this strong presumption of effectiveness bears a difficult burden because constitutionally acceptable performance is not defined narrowly and encompasses a "wide range." The test of ineffectiveness has little or nothing to do with what the *best* lawyers would have done. Nor is the test even what most good lawyers would have done. We only ask whether a reasonable lawyer would have acted, under the circumstances, as defense counsel acted in the case at issue. We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at the time, in fact, worked adequately.

6

*Id.* at 16, 459 S.E.2d at 127.

Petitioner maintains he told counsel he wanted an "all or nothing" defense. Conversely, Mr. Rodgers testified at petitioner's omnibus evidentiary hearing that he and Mr. Wilcher had discussed their trial strategy with petitioner before trial. Thus, the habeas court was required to weigh the credibility of both witnesses. Given that the habeas court denied relief on this ground, we can only presume that the court found Mr. Rogers' testimony to be more credible than petitioner's testimony on this point. As we have said, "[a]n appellate court may not decide the credibility of witnesses or weigh evidence as that is the exclusive function and task of the trier of fact." *State v. Guthrie*, 194 W.Va. 657, 669 n. 9, 461 S.E.2d 163, 175 n. 9 (1995); *see also State ex rel. Daniel v. Legursky*, 195 W.Va. 314, 327, 465 S.E.2d 416, 429 (1995) ("In cases where there is a conflict of evidence between defense counsel and the defendant, the circuit court's findings will usually be upheld.").

With regard to petitioner's argument that he is entitled to a presumption of prejudice, the Supreme Court has said that prejudice may be presumed in certain very narrow circumstances, such as where the deprivation of counsel is obvious and egregious. *See Bell v. Cone*, 535 U.S. 685, 695 (2002) (quoting and citing *Cronic*, 466 U.S. 648, 658-59 (1984)). The Supreme Court identified three such circumstances: (1) "complete denial of counsel" at "a critical stage"; (2) constructive denial of counsel where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing"; and (3) instances where "counsel is called upon to render assistance under circumstances where competent counsel very likely could not." *Bell*, 535 U.S. at 695-96. "That a case warrants a finding of presumed prejudice under any of these three prongs is 'an extremely high showing for a criminal defendant to make.' *Brown v. French*, 147 F.3d 307, 313 (4th Cir. 1998)." *United States v. Ragin*, 820 F.3d 609, 618 (4th Cir. 2016).

It is unclear which of these three circumstances petitioner claims. Clearly, petitioner did not have a "complete denial of counsel" on closing argument given that Mr. Wilcher made a lengthy closing on petitioner's behalf. Nor does petitioner claim an instance in which "counsel is called upon to render assistance under circumstances where competent counsel very likely could not." Thus, we presume petitioner is claiming that he was constructively denied counsel when Mr. Wilcher conceded his guilt on closing. "A constructive denial of counsel occurs . . . in only a very narrow spectrum of cases where the circumstances leading to counsel's ineffectiveness are so egregious that the defendant was *in effect denied any meaningful assistance at all*." *Childress v. Johnson*, 103 F.3d 1221, 1229 (5th Cir. 1997) (citation omitted) (emphasis added). For example, defense counsel was found to be constructively denied where defense counsel slept through a substantial portion of the defendant's trial. *See Ragin*, 820 F.3d at 612.

Here, petitioner was not "in effect, denied any meaningful assistance at all." In fact, the record on appeal shows that petitioner's trial counsel made an opening statement, lodged multiple objections, cross-examined all but three of the State's twenty-plus witnesses, called an expert and a rebuttal witness during petitioner's case-in-chief, and—as noted above—made a lengthy closing argument. Petitioner complains only of trial counsel's strategic decision-making with regard to closing. Thus, because petitioner fails to make the requisite "extremely high showing" required for a presumption of prejudice, we find the habeas court did not err in

7

applying *Strickland's* two-pronged analysis instead of *Cronic's* presumed prejudice analysis. *See generally Childress*, 103 F.3d at 1229.

With regard to Mr. Wilcher's closing, he made a tactical decision to acknowledge the State's copious evidence against petitioner, but then highlighted that evidence of premeditation and malice were lacking. Indeed, as the habeas court found, "Mr. Wilcher zealously advocated for his client to the point of suggesting that the jury should strongly consider the lesser included crime of voluntary manslaughter." Accordingly, we concur with the circuit court's finding that petitioner failed to establish that Mr. Wilcher's performance on closing was objectively deficient under the first prong of *Strickland*. As for the second prong of *Strickland*, even if we assume that Mr. Wilcher's performance was deficient, and it was not, there was no likelihood of a different result given the overwhelming evidence adduced at trial of petitioner's guilt.

In petitioner's second assignment of error, he argues that he was denied effective assistance of counsel due to Mr. Rodgers's conflict of interest regarding State witness Elisha F. Petitioner points out that his first trial counsel, Mr. Gunnoe, withdrew because he had previously represented Elisha F. Petitioner claims Mr. Rodgers should have likewise withdrawn because he too once represented Elisha F., in a child abuse and neglect case. Petitioner maintains that Mr. Rodgers's cross-examination and recross-examination of Elisha F. at trial was neither thorough nor probing. Petitioner points out that Mr. Rodgers failed to cross-examine Elisha F. regarding her lack of veracity with CPS. Instead, Mr. Rodgers asked Elisha F.'s CPS caseworker, Jennifer Ratliff, whether Elisha F. was dishonest. Petitioner highlights that "a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief." *Cuyler v. Sullivan*, 446 U.S. 335, 349-50 (1980) (citation omitted).

In this regard,

> [t]he *Strickland* Court recognized that a claim of ineffective assistance of counsel arising from counsel's conflict of interest presents a special case subject to the standard articulated by [*Sullivan*] . . . . To establish ineffective assistance of counsel on conflict of interest grounds, a petitioner must establish that (1) his attorney labored under "an actual conflict of interest" that (2) "adversely affected his lawyer's performance." *See Sullivan*, 446 U.S. at 348. After a petitioner satisfies this two-part test, prejudice is presumed. *Sullivan*, 446 U.S. at 349. . . .

*Mickens v. Taylor*, 240 F.3d 348, 355 (4th Cir. 2001), *aff'd*, 535 U.S. 162 (2002). Here, petitioner fails to support his claim that Mr. Rogers had "an actual conflict of interest" with regard to Elisha F. given that Mr. Rogers' representation of Elisha F. ended six months before the trial court appointed Mr. Rogers to represent petitioner. "'[U]ntil'. . . 'a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance.'" *Mickens*, 535 U.S. at 175 (citing *Sullivan*, 446 U.S. at 350). Accordingly, petitioner fails to establish the first prong of *Sullivan*: that Mr. Rogers labored under "an actual conflict of interest."

Petitioner also fails to support his claim that Mr. Rogers's performance was adversely affected by his past representation of Elisha F. At trial, Mr. Rodgers engaged in a lengthy cross-examination and recross-examination of Elisha F. during which he tested her memory and the quality of her testimony. Mr. Rogers also called Elisha F.'s credibility into question through the testimony of CPS social worker Jennifer Ratliff who testified to Elisha F.'s lack of veracity. Given that Elisha F. may have denied lying to CPS, Mr. Rogers' decision to question Ms. Ratliff about Elisha F.'s credibility was not unreasonable. We have said, "[t]he method and scope of cross-examination 'is a paradigm of the type of tactical decision that [ordinarily] cannot be challenged as evidence of ineffective assistance of counsel.'" *Coleman v. Painter*, 215 W. Va. 592, 596, 600 S.E.2d 304, 308 (2004)) (quoting *Legursky*, 195 W.Va. at, 328, 465 S.E.2d at 430 (citations omitted)).

Thus, because petitioner fails to satisfy both parts of the *Sullivan* test, he must show prejudice to obtain relief. In that regard, we concur with the habeas court's finding that, even if another attorney had cross-examined Elisha F., the outcome at trial would not have changed given the overwhelming evidence of petitioner's guilt. Thus, we find no error.

In petitioner's third assignment of error, he argues that he was denied effective assistance of counsel because his trial counsel failed, in four different ways, to conduct an adequate pretrial investigation. Petitioner first argues that he was prejudiced by counsel's failure to adequately consult with him prior to trial.

At petitioner's December 7, 2015, omnibus evidentiary hearing, his first appointed counsel, Richard Gunnoe, testified that, as part of his investigation of petitioner's case, he hired a private investigator, visited the crime scene and took photographs, and interviewed a potential witness. Mr. Gunnoe also stated that he had several meetings with petitioner during which he reviewed most, if not all, of his discovery with petitioner. In total, Mr. Gunnoe spent 11.8 hours investigating petitioner's case and meeting with him, before he withdrew as counsel. Importantly, Mr. Gunnoe testified that he provided all of the information he had gathered on petitioner's case to Mr. Wilcher.

The record on appeal also shows that Mr. Wilcher spent 16.2 hours conducting his own investigation of petitioner's case during which he twice discussed the case with Mr. Gunnoe. Mr. Wilcher also obtained the victim's medical records, reviewed the physical evidence in the custody of the police, interviewed counseling staff who had worked with the victim's daughters, reviewed a potential expert witness, interviewed the investigating officer, and conferenced a lawyer who worked in the victim's underlying child and abuse case.

In addition, the record on appeal shows that Mr. Rogers, Mr. Wilcher's co-counsel, conducted his own 4.7 hour-long investigation into petitioner's case. That investigation included locating an expert witness and corresponding with a forensic pathologist. Mr. Rogers also met with petitioner for a total of 5.9 hours on six different dates. At the omnibus evidentiary hearing, Mr. Rogers testified that Mr. Wilcher was lead counsel, that Mr. Wilcher visited petitioner twice at the jail and that he visited petitioner once there. Mr. Wilcher also testified that he and Mr. Wilcher met with petitioner every time the court held a status conference or evidentiary hearing in the case. Finally, Mr. Rogers testified that the potential witnesses suggested by petitioner

would not have been helpful to petitioner's case.

Petitioner also claims that trial counsel failed to conduct an adequate pretrial investigation because they did not interview the victim's daughters prior to trial. Petitioner asserts that, as a result, counsel was unable to challenge the daughters' inconsistent claims regarding who caused the victim's injuries (their biological father or petitioner), and their claim that petitioner "brainwashed" them.

The decision to interview a child witness prior to trial is a strategic decision. Strategic trial decisions generally cannot form the basis of a claim of ineffective assistance of counsel. *See* Syl. Pt. 6, *Miller*, 194 W.Va. at 6-7, 459 S.E.2d at 117-18. Further, as noted above, during Mr. Wilcher's investigation, he obtained the victim's medical records, interviewed counseling staff who had worked with the victim's daughters, and conferenced with a lawyer involved in the victim's underlying child and abuse case that regarded her daughters. Moreover, the record on appeal shows that Mr. Wilcher effectively cross-examined the victim's daughters by calling into question their memories of the relevant events and that fact that they both initially blamed their biological father for the victim's death.

Petitioner next argues that trial counsel failed to conduct an adequate pretrial investigation because they failed to retain an expert to challenge the testimony of Clinical Psychologist Bridgett Magnetti, the daughters' trauma therapist, or to prepare Mr. Rodgers for his cross-examination of Ms. Magnetti, which petitioner claims was ineffective. The decision to call an expert witness is a strategic decision that generally cannot form the basis of a claim of ineffective assistance of counsel. *Id.* Here, Ms. Magnetti's testimony did not pertain to whether petitioner murdered the victim. Instead, she testified to the trauma suffered by the victim's daughters and offered an opinion regarding why they changed their initial story that the victim had been with their biological father on the night she was injured. Trial counsel moved to exclude Ms. Magnetti's testimony on relevancy grounds, although the trial court denied the motion. Further, trial counsel strategically kept their cross-examination of Ms. Magnetti very brief given that the State had Ms. Magnetti testify to buttress the children's credibility. Moreover, trial counsel attempted to get Ms. Magnetti to concede that the children may have had memory problems or difficulty correctly remembering events.

Petitioner also argues that trial counsel failed to retain an expert on child sexual abuse and child memory issue to attack the victim's daughters' credibility. We disagree. Petitioner was on trial for murder, and not for sexually abusing the victim's daughters. At best, a child sexual abuse or memory expert would have testified to collateral issues, which could have confused the jury or caused them to fixate on the children's sexual abuse.

Finally, petitioner claims that the investigation was inadequate because counsel failed to have DNA testing conducted on a toenail found on the decedent's body. Petitioner claims that this error precluded the defense from arguing that a third party perpetrated the crime. We reject petitioner's claim on that ground that he never mentioned to the police that an alternate perpetrator caused the victim's injuries; nor did the defense put on any evidence that a perpetrator other than petitioner was at the scene. In fact, petitioner told the police that the victim

accidentally fell down the steps. Accordingly, there was no reason to believe that DNA testing of the toenail found at the scene would have provided exculpatory evidence.

Accordingly, we find that petitioner fails to support his claim his counsel's investigation and strategic decisions were deficient under an objective standard of reasonableness. Specifically, we reject petitioner's claims that counsel's pretrial consultations with petitioner and their strategic decisions not to interview the victim's daughters, not to retain or call certain expert witnesses, and not to conduct DNA testing on the toenail were deficient under an objective standard of reasonableness. That said, even if we had found counsel's investigation to be objectively deficient, there was simply no reasonable probability that the outcome at trial would have changed given the copious evidence of petitioner's guilt.

In petitioner's fourth and final assignment of error, he argues that even if no one single error rises to the level of prejudice, his trial counsel's errors were cumulatively prejudicial and require the reversal of his conviction. Having found no error, we reject this claim.

For the foregoing reasons, we affirm the circuit court's May 5, 2016, order denying habeas relief.

Affirmed.

**ISSUED:** September 1, 2017

**CONCURRED IN BY:**
Chief Justice Allen H. Loughry II
Justice Margaret L. Workman
Justice Menis E. Ketchum
Justice Elizabeth D. Walker

**DISSENTING:**
Justice Robin Jean Davis

11